O'DELL *v.* NETHERLAND, WARDEN, ET AL.

No. 96–6867.   Argued March 18, 1997—Decided June 19, 1997

152

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 168.

*Robert S. Smith*, by appointment of the Court, 520 U. S. 1114, argued the cause for petitioner. With him on the briefs were *Alan Effron* and *Michele J. Brace*.

*Katherine P. Baldwin*, Assistant Attorney General of Virginia, argued the cause for respondents. With her on the brief were *James S. Gilmore III*, Attorney General, and *David E. Anderson*, Chief Deputy Attorney General.

JUSTICE THOMAS delivered the opinion of the Court.

This case presents the question whether the rule set out in *Simmons* v. *South Carolina*, 512 U. S. 154 (1994)—which requires that a capital defendant be permitted to inform his sentencing jury that he is parole ineligible if the prosecution argues that he presents a future danger—was "new" within the meaning of *Teague* v. *Lane*, 489 U. S. 288 (1989), and thereby inapplicable to an already final death sentence. We conclude that it was new, and that it cannot, therefore, be used to disturb petitioner's death sentence, which had been final for six years when *Simmons* was decided.

I

Helen Schartner was last seen alive late in the evening of February 5, 1985, leaving the County Line Lounge in Virginia Beach, Virginia. Her lifeless body was discovered the next day, in a muddy field across a highway from the lounge. Schartner's head had been laid open by several blows with the barrel of a handgun, and she had been strangled with such violence that bones in her neck were broken and finger imprints were left on her skin. An abundance of physical evidence linked petitioner to the crime scene and crime—among other things, tire tracks near Schartner's body were consistent with petitioner's car, and bodily fluids recovered

from Schartner's body matched petitioner. He was indicted on counts of capital murder, rape, sodomy, and abduction (which count was later dismissed).

After a jury trial, petitioner was found guilty on the murder, rape, and sodomy counts. During the subsequent sentencing hearing, the prosecution sought to establish two aggravating factors: that petitioner presented a future danger, and that the murder had been "wanton, vile or inhuman." Evidence was presented that, prior to Schartner's murder, petitioner had been convicted of a host of other offenses, including the kidnaping and assault of another woman while he was on parole, and the murder of a fellow inmate during an earlier prison stint. Petitioner sought a jury instruction explaining that he was not eligible for parole if sentenced to life in prison. The trial judge denied petitioner's request. After the sentencing hearing, the jury found beyond a reasonable doubt that petitioner "would constitute a continuous serious threat to society" and that "his conduct in committing the offense was outrageously wanton, vile or inhuman." 46 Record 208. The jury recommended that petitioner be sentenced to death.[1] The trial judge adopted the jury's recommendation and sentenced petitioner to 40 years' imprisonment each for the rape and sodomy convictions, and to death by electrocution for Schartner's murder. Petitioner appealed to the Supreme Court of Virginia, which affirmed both the conviction and the sentence. *O'Dell* v. *Commonwealth*, 234 Va. 672, 364 S. E. 2d 491 (1988). We denied certiorari. *O'Dell* v. *Virginia*, 488 U. S. 871 (1988). Petitioner's efforts at state habeas relief were unsuccessful, and we again denied certiorari. *O'Dell* v. *Thompson*, 502 U. S. 995 (1991).

---

[1] The Virginia Supreme Court concluded that the jury's recommendation of a death sentence was based only on the first aggravating factor—petitioner's future dangerousness. *O'Dell* v. *Commonwealth*, 234 Va. 672, 706, 364 S. E. 2d 491, 510 (1988). Only that aggravating factor is before us.

Petitioner then filed a federal habeas claim. He contended, *inter alia*, that newly obtained DNA evidence established that he was actually innocent, and that his death sentence was faulty because he had been prevented from informing the jury of his ineligibility for parole. The District Court rejected petitioner's claim of innocence. *O'Dell* v. *Thompson*, Civ. Action No. 3:92CV480 (ED Va., Sept. 6, 1994), App. 171–172. But it agreed with petitioner that he was entitled to resentencing under the intervening decision in *Simmons* v. *South Carolina, supra.* The District Court described *Simmons* as holding that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, the Due Process Clause of the Fourteenth Amendment requires that the sentencing jury be informed that the defendant is not eligible for parole." App. 198. The court concluded that the *Simmons* rule was not new and thus was available to petitioner. Because the prosecutor "obviously used O'Dell's prior releases on cross-examination, and in his closing argument, to argue that the defendant presented a future danger to society," App. 201 (citations omitted), the District Court held that petitioner was entitled to be resentenced if it could be demonstrated that he was in fact ineligible for parole.

A divided en banc Court of Appeals for the Fourth Circuit reversed. 95 F. 3d 1214 (1996). After an exhaustive review of our precedents, the Court of Appeals majority determined that "*Simmons* was the paradigmatic 'new rule,'" *id.*, at 1218, and, as such, could not aid petitioner. The Fourth Circuit was closely divided as to whether *Simmons* set forth a new rule, but every member of the court agreed that petitioner's "claim of actual innocence [was] not even colorable." 95 F. 3d, at 1218; see also *id.*, at 1255–1256 (Ervin, J., concurring in part and dissenting in part). We declined review on petitioner's claim of actual innocence, but granted certiorari to determine whether the rule of *Simmons* was new. 519

U. S. 1050 (1996); see also *ibid.* (SCALIA, J., respecting the grant of certiorari).

## II

Before a state prisoner may upset his state conviction or sentence on federal collateral review, he must demonstrate as a threshold matter that the court-made rule of which he seeks the benefit is not "new." We have stated variously the formula for determining when a rule is new. See, *e. g.,* *Graham* v. *Collins,* 506 U. S. 461, 467 (1993) ("A holding constitutes a 'new rule' within the meaning of *Teague* if it 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not *'dictated* by precedent existing at the time the defendant's conviction became final'") (quoting *Teague,* 489 U. S., at 301) (emphasis in original). At bottom, however, the *Teague* doctrine "validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler* v. *McKellar,* 494 U. S. 407, 414 (1990) (citation omitted). "Reasonableness, in this as in many other contexts, is an objective standard." *Stringer* v. *Black,* 503 U. S. 222, 237 (1992). Accordingly, we will not disturb a final state conviction or sentence unless it can be said that a state court, at the time the conviction or sentence became final, would have acted objectively unreasonably by not extending the relief later sought in federal court.

The *Teague* inquiry is conducted in three steps. First, the date on which the defendant's conviction became final is determined. *Lambrix* v. *Singletary,* 520 U. S. 518, 527 (1997). Next, the habeas court considers whether "'a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.'" *Ibid.* (quoting *Saffle* v. *Parks,* 494 U. S. 484, 488 (1990)) (alterations in *Lambrix*). If not, then the rule is new. If the rule is determined to be new, the final step in the *Teague* analysis requires the court to determine whether

the rule nonetheless falls within one of the two narrow exceptions to the *Teague* doctrine. 520 U. S., at 527. The first, limited exception is for new rules "forbidding criminal punishment of certain primary conduct [and] rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Penry* v. *Lynaugh*, 492 U. S. 302, 330 (1989). The second, even more circumscribed, exception permits retroactive application of "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Graham*, *supra*, at 478 (quoting *Teague*, *supra*, at 311) (internal quotation marks omitted). "Whatever the precise scope of this [second] exception, it is clearly meant to apply only to a small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty." *Graham*, *supra*, at 478 (internal quotation marks omitted).

## III

Petitioner's conviction became final on October 3, 1988, when we declined to review the Virginia Supreme Court's decision affirming his sentence on direct review. *Simmons*, the rule of which petitioner now seeks to avail himself, was decided in 1994.

In *Simmons*, the defendant had been found guilty of capital murder for the brutal killing of an elderly woman. The defendant had also assaulted other elderly women, resulting in convictions that rendered him—at least as of the time he was sentenced—ineligible for parole. Prosecutors in South Carolina are permitted to argue to sentencing juries that defendants' future dangerousness is an appropriate consideration in determining whether to affix a sentence of death. 512 U. S., at 162–163 (plurality opinion). Simmons sought to rebut the prosecution's "generalized argument of future dangerousness" by presenting the jury with evidence that "his dangerousness was limited to elderly women," none of whom he was likely to encounter in prison. *Id.*, at 157.

Simmons' efforts to shore up this argument by demonstrating to the jury that, under South Carolina law, he was ineligible for parole were rebuffed by the trial court. This Court reversed the judgment of the South Carolina Supreme Court upholding Simmons' death sentence. A plurality of the Court noted that a prosecutor's future dangerousness argument will "necessarily [be] undercut" by "the fact that the alternative sentence to death is life without parole." *Id.*, at 169. The plurality, relying on *Gardner* v. *Florida*, 430 U. S. 349 (1977), and *Skipper* v. *South Carolina*, 476 U. S. 1 (1986), concluded that "[b]ecause truthful information of parole ineligibility allows the defendant to 'deny or explain' the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention." 512 U. S., at 169.

JUSTICE O'CONNOR, joined by THE CHIEF JUSTICE and JUSTICE KENNEDY, concurred in the judgment, providing the dispositive votes necessary to sustain it. The concurrence recognized:

> "[The Court has] previously noted with approval . . . that '[m]any state courts have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon, or parole.' *California* v. *Ramos*, 463 U. S. [992, 1013, n. 30 (1983)]. The decision whether or not to inform the jury of the possibility of early release is generally left to the States." *Id.*, at 176.

The concurrence also distinguished *Skipper*, noting that *Skipper* involved an attempt to introduce "factual evidence" regarding the defendant himself, while Simmons "sought to rely on the operation of South Carolina's sentencing law" to demonstrate that he did not present a future danger. 512 U. S., at 176. But the concurrence nonetheless concluded that, "[w]hen the State seeks to show the defendant's future

dangerousness," the defendant "should be allowed to bring his parole ineligibility to the jury's attention." *Id.*, at 177.

Petitioner asserts that the *Simmons* rule covers his case, and that because he was parole ineligible—but not allowed to relay that information to the jury in order to rebut the prosecutor's argument as to his future dangerousness—*Simmons* requires vacatur of his sentence. Before we can decide whether petitioner's claim falls within the scope of *Simmons*, we must determine whether the rule of *Simmons* was new for *Teague* purposes, and, if so, whether that rule falls within one of the two exceptions to *Teague*'s bar.

## A

We observe, at the outset, that *Simmons* is an unlikely candidate for "old-rule" status. As noted above, there was no opinion for the Court. Rather, Justice Blackmun's plurality opinion, for four Members, concluded that the Due Process Clause required allowing the defendant to inform the jury—through argument or instruction—of his parole ineligibility in the face of a prosecution's future dangerousness argument. 512 U. S., at 168–169. Two Members of the plurality, JUSTICE SOUTER and JUSTICE STEVENS, would have further held that the Eighth Amendment mandated that the trial court instruct the jury on a capital defendant's parole ineligibility even if future dangerousness was not at issue. *Id.*, at 172–174 (SOUTER, J., concurring). JUSTICE GINSBURG, also a Member of the plurality, wrote a concurrence grounded in the Due Process Clause. *Id.*, at 174–175. THE CHIEF JUSTICE and JUSTICE KENNEDY joined JUSTICE O'CONNOR's decisive opinion concurring in the judgment, as described above. *Id.*, at 175–178. And, two Justices dissented, arguing that the result did not "fit" the Court's precedents and that it was not, in any case, required by the Constitution. *Id.*, at 180, 185 (opinion of SCALIA, J., joined by THOMAS, J.). The array of views expressed in *Simmons* itself suggests that the rule announced there was, in light of

this Court's precedent, "susceptible to debate among reasonable minds." *Butler*, 494 U. S., at 415; cf. *Sawyer* v. *Smith*, 497 U. S. 227, 236–237 (1990) (citing, as evidence that *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985), announced a new rule, the views of the three *Caldwell* dissenters). An assessment of the legal landscape existing at the time petitioner's conviction and sentence became final bolsters this conclusion.

1

Petitioner's review of the relevant precedent discloses the decisions relied upon in *Simmons*, namely, *Gardner* v. *Florida*, *supra*, and *Skipper* v. *South Carolina*, *supra*. Petitioner asserts that a reasonable jurist considering his claim in light of those two decisions "would have felt 'compelled . . . to conclude that the rule [petitioner] seeks was required by the Constitution.'" Brief for Petitioner 14 (quoting *Saffle*, 494 U. S., at 488) (emphasis deleted).

In *Gardner*, the defendant received a death sentence from a judge who had reviewed a presentence report that was not made available to the defendant. *Gardner* produced no opinion for the Court. A plurality of the Court concluded that the defendant "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." 430 U. S., at 362. Justice White concurred in the judgment, providing the narrowest grounds of decision among the Justices whose votes were necessary to the judgment. Cf. *Marks* v. *United States*, 430 U. S. 188, 193 (1977). He concluded that the Eighth Amendment was violated by a "procedure for selecting people for the death penalty which permits consideration of such secret information relevant to the *character and record of the individual offender*." 430 U. S., at 364 (internal quotation marks omitted; emphasis added).

In *Skipper*, the prosecutor argued during the penalty phase that a death sentence was appropriate because the defendant "would pose disciplinary problems if sentenced to

prison and would likely rape other prisoners." 476 U. S., at 3. Skipper's efforts to introduce evidence that he had behaved himself in, and made a "good adjustment" to, jail in the time between his arrest and his trial were rejected by the trial court. *Ibid.* The Court concluded: "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under *Eddings* [v. *Oklahoma,* 455 U. S. 104 (1982)], such evidence may not be excluded from the sentencer's consideration." 476 U. S., at 5 (footnote omitted). This holding was grounded, as was *Eddings,* in the Eighth Amendment. The Court also cited the Due Process Clause, stating that "[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty," due process required that "a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.'" 476 U. S., at 5, n. 1 (quoting *Gardner, supra,* at 362).

*Simmons,* argues petitioner, presented merely a variation on the facts of *Skipper.* In each, the prosecution raised the issue of future dangerousness. Skipper was unconstitutionally prevented from demonstrating that he had behaved in prison and thus would not be a danger to his fellow prisoners. Simmons, likewise, says petitioner, was not allowed to inform the jury that he would be in, rather than out of, prison and so could not present a danger to elderly women. Because the rule of *Simmons* was allegedly set forth in the 1986 decision in *Skipper,* which in turn relied upon the 1977 decision in *Gardner,* petitioner argues that his death sentence was flawed when affirmed in 1988, and we may set it aside without running afoul of *Teague.*[2]

---

[2] Petitioner makes much of language in the *Simmons* plurality opinion that the "principle announced in *Gardner* was reaffirmed in *Skipper,* and it *compels* our decision today." *Simmons* v. *South Carolina,* 512 U. S. 154, 164–165 (1994) (emphasis added). While this language, expressing the view of four Justices, is certainly evidence tending to prove that the

Even were these two cases the sum total of relevant precedent bearing on the rule of *Simmons*, petitioner's argument that the result in *Simmons* followed ineluctably would not be compelling. *Gardner* produced seven opinions, none for a majority of the Court. Taking the view expressed in Justice White's opinion concurring in the judgment as the rule of *Gardner*, see *Marks, supra,* at 193, the holding is a narrow one—that "[a] procedure for selecting people for the death penalty which permits consideration of . . . secret information relevant to the *character and record of the individual offender*" violates the Eighth Amendment's requirement of "reliability in the determination that death is the appropriate punishment." 430 U. S., at 364 (citation and internal quotation marks omitted; emphasis added). Petitioner points to no secret evidence given to the sentencer but not to him. And, the evidence that he sought to present to the jury was not historical evidence about his "character and record," but evidence concerning the operation of the extant legal regime.

In *Skipper*, too, the evidence that the defendant was unconstitutionally prevented from adducing was evidence of his past behavior. It is a step from a ruling that a defendant must be permitted to present evidence of that sort to a requirement that he be afforded an opportunity to describe the extant legal regime. Cf. *Simmons*, 512 U. S., at 176 (O'CONNOR, J., concurring in judgment).

2

Whatever support *Gardner* and *Skipper*, standing alone, might lend to petitioner's claim that *Simmons* was a foregone conclusion, the legal landscape in 1988 was far more complex. Respondents point to, and the Fourth Circuit ma-

---

rule of *Simmons* was not new—*i. e.,* that it was "dictated" by then-existing precedent—it is far from conclusive. We have noted that "[c]ourts frequently view their decisions as being 'controlled' or 'governed' by prior opinions even when aware of reasonable contrary conclusions reached by other courts." *Butler* v. *McKellar*, 494 U. S. 407, 415 (1990).

jority relied on, two other cases that had been decided by the time petitioner's conviction became final and that bear on its constitutionality: *California* v. *Ramos*, 463 U. S. 992 (1983), and *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985). In *Ramos*, the Court upheld an instruction that informed the jury that a defendant sentenced to life in prison without parole could nonetheless be rendered parole eligible if the Governor elected to commute his sentence. The Court concluded that the instruction neither introduced a constitutionally irrelevant factor into the sentencing process, 463 U. S., at 1001–1004, nor diverted the jury's attention from the task of rendering an "individualized sentencing determination," *id.*, at 1005. Within the bounds of the Constitution, the Court stated that it would defer to California's "identification of the Governor's power to commute a life sentence as a substantive factor to be presented for the sentencing jury's consideration." *Id.*, at 1013. We emphasized, however, that this conclusion was not to be taken to "override the contrary judgment of state legislatures" that capital juries *not* learn of a Governor's commutation power. *Ibid.* "Many state courts," we pointed out, "have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon, or *parole*." *Id.*, at 1013, n. 30 (emphasis added); see also *ibid.* (citing, *inter alia*, Ga. Code Ann. § 17–8–76 (1982), and describing that statute as "prohibiting argument as to possibility of pardon, *parole*, or clemency" (emphasis added)). "We sit as judges, not as legislators, and the wisdom of the decision to permit juror consideration of possible commutation is best left to the States." 463 U. S., at 1014. The dissenters in *Ramos* disputed the constitutionality of *ever* informing juries of the Governor's power to commute a death sentence. See *id.*, at 1018 (opinion of Marshall, J., joined by Brennan and Blackmun, JJ.); see also *id.*, at 1019–1020 (asserting that consideration by a capital sentencing jury

of a defendant's prospects for commutation *or parole* is unconstitutional).

The general proposition that the States retained the prerogative to determine how much (if at all) juries would be informed about the postsentencing legal regime was given further credence in *Caldwell* v. *Mississippi, supra.* In that case, the prosecution and the judge had, the Court concluded, improperly left the jury with the impression that a death sentence was not final because it would be extensively reviewed. Justice Marshall authored the opinion for the Court except for one portion. In that portion, Justice Marshall—writing for a plurality—concluded that, *Ramos* notwithstanding, sentencing juries were not to be given information about postsentencing appellate proceedings. JUSTICE O'CONNOR, who provided the fifth vote necessary to the judgment, did not join this portion of Justice Marshall's opinion. She wrote separately, stating that, under *Ramos*, a State could choose whether or not to "instruc[t] the jurors on the sentencing procedure, including the existence and limited nature of appellate review," so long as any information it chose to provide was accurate. 472 U. S., at 342 (opinion concurring in part and concurring in judgment).

### 3

In light of *Ramos* and *Caldwell*, we think it plain that a reasonable jurist in 1988 would not have felt *compelled* to adopt the rule later set out in *Simmons.* As noted above, neither *Gardner* nor *Skipper* involved a prohibition on imparting information concerning what might happen, under then-extant law, after a sentence was imposed. Rather, the information at issue in each case was information pertaining to the defendant's "character and record." Although the principal opinions in *Simmons* found *Skipper* (which, in turn, relied on *Gardner*) persuasive, JUSTICE O'CONNOR distinguished *Skipper* from the facts presented in *Simmons* on this very ground, see 512 U. S., at 176 (opinion concurring

in judgment), suggesting that the rule announced in *Simmons* was not inevitable. See also *id.,* at 183 (SCALIA, J., dissenting).

That distinction—between information concerning state postsentencing law on the one hand and evidence specifically related to the defendant on the other—was also at the heart of *Ramos* and *Caldwell.* In *Ramos,* the majority concluded that California had reasonably chosen to provide some, limited, postsentence information to the capital sentencing jury—though it noted that many other States had elected just the opposite. The principal dissent in *Ramos* would have forbidden the provision of *any* information about postsentence occurrences for the very reason that it did not constitute evidence concerning the defendant's "character or the nature of his crime." 463 U. S., at 1022 (opinion of Marshall, J.). In *Caldwell,* the plurality and JUSTICE O'CONNOR contested whether the fact that "appellate review is available to a capital defendant sentenced to death" was "simply a factor that in itself is wholly irrelevant to the determination of the appropriate sentence" (as the plurality concluded, 472 U. S., at 336), or whether provision of that information was a constitutional "policy choice in favor of jury education" (as JUSTICE O'CONNOR concluded, *id.,* at 342 (opinion concurring in part and concurring in judgment)).

A reasonable jurist in 1988, then, could have drawn a distinction between information about a defendant and information concerning the extant legal regime. It would hardly have been *unreasonable* in light of *Ramos* and *Caldwell* for the jurist to conclude that his State had acted constitutionally by choosing not to advise its jurors as to events that would (or would not) follow their recommendation of a death sentence, as provided by the legal regime of the moment. Indeed, given the sentiments, expressed in Justice Marshall's *Ramos* dissent and *Caldwell* plurality, that information about postsentence procedures was *never* to go to the jury and given that the decision whether to provide such informa-

tion had been described by the *Ramos* majority opinion and JUSTICE O'CONNOR's concurrence in *Caldwell* as a "policy choice" left to the States, the reasonable jurist may well have concluded that the most surely constitutional course, when confronted with a request to inform a jury about a defendant's parole eligibility, was silence.

*Teague* asks state-court judges to judge reasonably, not presciently. See *Stringer* v. *Black*, 503 U. S., at 244 (SOUTER, J., dissenting). In *Simmons*, the Court carved out an exception to the general rule described in *Ramos* by, for the first time ever, requiring that a defendant be allowed to inform the jury of postsentencing legal eventualities. A 1988 jurist's failure to predict this cannot, we think, be deemed unreasonable. Accordingly, the rule announced in *Simmons* was new, and petitioner may not avail himself of it unless the rule of *Simmons* falls within one of the exceptions to *Teague*'s bar.[3]

---

[3] Our conclusion that the rule of *Simmons* was new finds support in the decisions of the state courts and the lower federal courts. See *Butler*, 494 U. S., at 415. By 1988, no state or federal court had adopted the rule of *Simmons*. In fact, both before and after *Skipper* v. *South Carolina*, 476 U. S. 1 (1986), several courts had upheld against constitutional challenge practices similar, if not identical, to that later forbidden in *Simmons*. See, *e. g., Turner* v. *Bass*, 753 F. 2d 342, 354 (CA4 1985), rev'd on other grounds *sub nom. Turner* v. *Murray*, 476 U. S. 28 (1986); *O'Bryan* v. *Estelle*, 714 F. 2d 365, 389 (CA5 1983), cert. denied *sub nom. O'Bryan* v. *McKaskle*, 465 U. S. 1013 (1984); *King* v. *Lynaugh*, 850 F. 2d 1055, 1057 (CA5 1988) (en banc), cert. denied, 488 U. S. 1019 (1989); *Peterson* v. *Murray*, 904 F. 2d 882, 886–887 (CA4), cert. denied, 498 U. S. 992 (1990); *Knox* v. *Collins*, 928 F. 2d 657, 660, 662 (CA5 1991); see also *Turner* v. *Commonwealth*, 234 Va. 543, 551–552, 364 S. E. 2d 483, 487–488, cert. denied, 486 U. S. 1017 (1988); *Mueller* v. *Commonwealth*, 244 Va. 386, 408–409, 422 S. E. 2d 380, 394 (1992), cert. denied, 507 U. S. 1043 (1993). In addition, several of the courts to consider the question have, along with the Fourth Circuit in this case, concluded that the rule of *Simmons* was new. See, *e. g., Johnson* v. *Scott*, 68 F. 3d 106, 111–112, n. 11 (CA5 1995), cert. denied *sub nom. Johnson* v. *Johnson*, 517 U. S. 1122 (1996); *Mueller* v. *Murray*, 252 Va. 356, 365–366, 478 S. E. 2d 542, 548 (1996); *Commonwealth* v.

Petitioner contends that, even if it is new, the rule of *Simmons* falls within the second exception to *Teague*, which permits retroactive application of "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Graham*, 506 U. S., at 478 (quoting *Teague*, 489 U. S., at 311). Petitioner describes the "practice condemned in *Simmons*" as a "shocking one." Brief for Petitioner 33. The rule forbidding it, we are told, is "on par" with *Gideon* v. *Wainwright*, 372 U. S. 335 (1963)—which we have cited as an example of the sort of rule falling within *Teague*'s second exception, see *Saffle*, 494 U. S., at 495—because "both cases rest upon this Court's belief that certain procedural protections are essential to prevent a miscarriage of justice," Brief for Petitioner 35 (citations omitted). We disagree.[4] Unlike the sweeping rule of *Gideon*, which established an affirmative right to counsel in all felony cases, the narrow right of rebuttal that *Simmons* affords to defendants in a limited class of capital cases has hardly "'"alter[ed] our understanding of the *bedrock procedural elements*"' essential to the fairness of a proceeding." *Sawyer*, 497 U. S., at 242 (quoting *Teague, supra*, at 311, quoting, in turn, *Mackey* v. *United States*, 401 U. S. 667, 693 (1971) (Harlan, J., concurring in judgments in part and dissenting in part) (emphasis in *Teague*)). *Simmons* possesses little of the "watershed" character envisioned by *Teague*'s second exception.

---

*Christy*, 540 Pa. 192, 215–217, 656 A. 2d 877, 888–889, cert. denied, 516 U. S. 872 (1995).

[4] It is by no means inevitable that, absent application of the rule of *Simmons*, "miscarriage[s] of justice" will occur. We note, for example, that at the time he was sentenced to death for Helen Schartner's murder, petitioner had already been convicted of a murder committed while he was in prison. Informing his sentencing jury that petitioner would spend the rest of his days in prison would not, then, necessarily have rebutted an argument that he presented a continuing danger.

## IV

For the reasons stated herein, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

Although petitioner's guilt has been established, it is undisputed that the conduct of the sentencing hearing that led to the imposition of his death penalty violated the Due Process Clause of the Fourteenth Amendment. His eligibility for a death sentence depended on the prosecutor's ability to convince the jury that there was a "probability that he would commit criminal acts of violence that would constitute a continuous threat to society." App. 69. In support of his argument to the jury that nothing short of the death penalty would be sufficient, the prosecutor emphasized petitioner's misconduct when he was "outside of the prison system," *id.,* at 61,[1] and stated that petitioner had "forfeited his right to live among us," *id.,* at 66. Nevertheless, the trial court re-

---

[1] During his closing statement at the sentencing proceeding, the prosecutor observed: "Isn't it interesting that he is only able to be outside of the prison system for a matter of months to a year and a half before something has happened again?" App. 61. And, after drawing out the parallels between the Virginia murder and a kidnaping and robbery for which petitioner had been convicted in Florida some years earlier, the prosecutor said: "We are a society of fair, honest people who believe in our government and who believe in our justice system; and I submit to you there was a failure in the Florida criminal justice system for paroling this man when they did." *Id.,* at 64.

The prosecutor concluded his argument by saying: "[Y]ou may still sentence him to life in prison, but I ask you ladies and gentlemen[,] in a system, in a society that believes in its criminal justice system and its government, what does this mean? . . . [A]ll the times he has committed crimes before and been before other juries and judges, no sentence ever meted out to this man has stopped him. Nothing has stopped him, and nothing ever will except the punishment that I now ask you to impose." *Id.,* at 66.

fused to allow petitioner to advise the jury that if the death sentence were not imposed, he would be imprisoned for the rest of his life without any possibility of parole. Thus, he was denied the opportunity to make a fair response to the prosecutor's misleading argument about the future danger that he allegedly posed to the community.

Our virtually unanimous decision in *Simmons* v. *South Carolina*, 512 U. S. 154 (1994),[2] recognized the fundamental unfairness of the restrictive procedure followed in this case. As JUSTICE O'CONNOR's opinion, which has been treated as expressing the narrowest ground on which the decision rested, explained:

> "'Capital sentencing proceedings must of course satisfy the dictates of the Due Process Clause,' *Clemons* v. *Mississippi*, 494 U. S. 738, 746 (1990), and one of the hallmarks of due process in our adversary system is the defendant's ability to meet the State's case against him. Cf. *Crane* v. *Kentucky*, 476 U. S. 683, 690 (1986). In capital cases, we have held that the defendant's future dangerousness is a consideration on which the State may rely in seeking the death penalty. See *California* v. *Ramos*, 463 U. S. 992, 1002–1003 (1983). But '[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, . . . the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain" [requires that the defendant be afforded an opportunity to introduce evidence on this point].' *Skipper* v. *South Carolina*, 476 U. S. 1, 5, n. 1 (1986), quoting *Gardner* v. *Florida*, 430 U. S. 349, 362 (1977) (plurality opinion); see

---

[2] In the years following our decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972) *(per curiam)*, unanimous Court opinions in capital cases have been virtually nonexistent. The decision in *Simmons* v. *South Carolina*, 512 U. S. 154 (1994), came closer than most, for only two Justices dissented.

also 476 U. S., at 9–10 (Powell, J., concurring in judgment)." *Id.*, at 175 (opinion concurring in judgment).

Thus, this case is not about whether petitioner was given a fair sentencing hearing; instead, the question presented is whether, despite the admittedly unfair hearing, he should be put to death because his trial was conducted before *Simmons* was decided. Because the Court regards the holding in *Simmons* as nothing more than a novel "court-made rule," *ante*, at 156, it rejects petitioner's plea. In my view, our decision in *Simmons* applied a fundamental principle that is as old as the adversary system itself, and that had been quite clearly articulated by this Court in two earlier opinions. Accordingly, I respectfully dissent.

## I

My analysis begins where the majority tersely ends—with petitioner's contention that the rule in *Simmons* implicates "the fundamental fairness and accuracy of the criminal proceeding," *Saffle* v. *Parks*, 494 U. S. 484, 495 (1990), and therefore should be retroactively applied even if it would constitute a "new" rule under *Teague* v. *Lane*, 489 U. S. 288, 307 (1989).

Our decision in *Teague* recognized two exceptions to the general rule of nonretroactivity. The relevant exception for our purposes establishes that "a new rule should be applied retroactively if it requires the observance of 'those procedures that . . . are "implicit in the concept of ordered liberty."'" *Ibid.* (quoting *Mackey* v. *United States*, 401 U. S. 667, 693 (1971) (Harlan, J., concurring in judgments in part and dissenting in part), in turn quoting *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937)). In the opinion that provided the basis for the limitations on collateral review adopted in *Teague*, Justice Harlan emphasized the importance of protecting "bedrock procedural elements" that are "essential to the substance of a full hearing." *Mackey*, 401 U. S., at 693–694. We endorsed that view, with the caveat that this

exception should be limited to those "procedures without which the likelihood of an accurate [determination of guilt or innocence] is seriously diminished." *Teague*, 489 U. S., at 313.[3]

Since *Teague* was decided, this Court has never found a rule so essential to the fairness of a proceeding that it would fall under this exception.[4] In my view, the right in *Simmons*—the right to respond to an inaccurate or misleading argument—is surely a bedrock procedural element of a full and fair hearing. As JUSTICE O'CONNOR recognized in her opinion in *Simmons*, this right to rebut the prosecutor's arguments is a "hallmar[k] of due process," 512 U. S., at 175 (opinion concurring in judgment). See also *id.*, at 174 (GINSBURG, J., concurring) ("This case is most readily resolved under a core requirement of due process, the right to be heard"). When a defendant is denied the ability to respond to the state's case against him, he is deprived of "his fundamental constitutional right to a fair opportunity to present a defense." *Crane* v. *Kentucky*, 476 U. S. 683, 687 (1986).

The Court today argues that *Simmons* defined only a "narrow right of rebuttal [for] defendants in a limited class of capital cases," *ante*, at 167, and therefore that the rule cannot be in that class of rules so essential to the accuracy of

---

[3] Although *Teague* v. *Lane*, 489 U. S. 288 (1989), focused on the accuracy of a guilt-innocence determination, we have long recognized that sentencing procedures, as well as trials, must satisfy the dictates of the Due Process Clause, see, *e. g.*, *Clemons* v. *Mississippi*, 494 U. S. 738, 746 (1990), and that the unique character of the death penalty mandates special scrutiny of those procedures in capital cases. An unfair procedure that seriously diminishes the likelihood of an accurate determination that a convicted defendant should receive the death penalty rather than life without parole—that the defendant is "innocent of the death penalty," see *Sawyer* v. *Whitley*, 505 U. S. 333, 341–343 (1992)—is plainly encompassed by *Teague*'s exception.

[4] The most commonly cited example of a rule so fundamental that it would fit this category is the right to counsel articulated in *Gideon* v. *Wainwright*, 372 U. S. 335 (1963).

a criminal proceeding that they are excepted from *Teague's* nonretroactivity principle.

The majority appears not to appreciate that the reason *Simmons'* holding applied directly to only a narrow class of capital defendants is because only a very few States had in place procedures that allowed the prosecutor to argue future dangerousness while at the same time prohibiting defendants from using "the only way that [they] can successfully rebut the State's case." 512 U. S., at 177 (O'CONNOR, J., concurring in judgment).[5] The prevailing rule in the States that provided a life-without-parole sentencing alternative required an instruction explaining that alternative to the jury.[6]

Although the majority relies on the limited impact of the *Simmons* rule to discount its importance, the broad consensus in favor of giving the jury accurate information in fact underscores the importance of the rule applied in *Simmons*. The rule's significance is further demonstrated by evidence of the effect that information about the life-without-parole alternative has on capital jury deliberations. For example, only 2 death sentences have been imposed in Virginia for crimes committed after January 1, 1995—whereas 10 were imposed in 1994 alone—and the decline in the number of death sentences has been attributed to the fact that juries in Virginia must now be informed of the life-without-parole alternative. See Green, Death Sentences Decline in Virginia, Richmond Times-Dispatch, Nov. 24, 1996,[7] p. A1. The

[5] See *Simmons*, 512 U. S., at 168, n. 8.

[6] See *id.*, at 167, n. 7 (listing the States whose capital punishment schemes in one way or another require the jury to be informed that life without parole is either the only available alternative sentence or one of the options from which the jury is free to choose).

[7] See also, *e. g.*, Comment, Truth in Sentencing: The Prospective and Retroactive Application of *Simmons v. South Carolina*, 63 U. Chi. L. Rev. 1573 (1996); Eisenberg & Wells, Deadly Confusion: Juror Instructions in Capital Cases, 79 Cornell L. Rev. 1, 7–9 (1993) ("[J]urors who believe the alternative to death is a relatively short time in prison tend to sentence

consensus among the scholars and practitioners who drafted the Model Penal Code is that instructing the jury completely about the available sentencing alternatives is the best way to ensure accuracy in sentencing. See American Law Institute, Model Penal Code § 210.6 (1980). And we affirmed this basic point in *Beck* v. *Alabama,* 447 U. S. 625, 637 (1980), when we acknowledged that the likelihood that a jury would find an obviously guilty defendant eligible for the death penalty was significantly increased when an arguably more appropriate sentencing alternative was not available.

Thus, even if the rule in *Simmons* could properly be viewed as a "new" rule, it is of such importance to the accuracy and fairness of a capital sentencing proceeding that it should be applied consistently to all prisoners whose death sentences were imposed in violation of the rule, whether they were sentenced before *Simmons* was decided or after. Moreover, to the extent that the fundamental principles underlying the rule needed explicit articulation by this Court, they clearly had been expressed well before petitioner's 1988 sentencing proceeding.

## II

Distinguishing new rules from those that are not new under our post-*Teague* jurisprudence is not an easy task, but it is evident to me that if there is such a thing as a rule that is not new for these purposes, the rule announced in *Simmons* is one.

In *Gardner* v. *Florida,* 430 U. S. 349 (1977), a plurality of the Court concluded that the defendant's due process rights had been violated because his "death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Id.,* at 362. Nine years later, in *Skipper* v. *South Carolina,* 476 U. S. 1 (1986), all

---

to death"); Paduano & Smith, Deathly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty, 18 Colum. Hum. Rts. L. Rev. 211 (1987).

nine Justices cited *Gardner,* with approval, as establishing the "elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.' *Gardner* v. *Florida,* 430 U. S. 349, 362 (1977)." 476 U. S., at 5, n. 1; see also *id.,* at 10–11 (Powell, J., concurring in judgment) ("The Court correctly concludes that the exclusion of the proffered testimony violated due process . . . . [P]etitioner's death sentence violates the rule in *Gardner*").

When the Court was presented with the facts in *Simmons,* it was no surprise that Justice Blackmun said that "[t]he principle announced in *Gardner* was reaffirmed in *Skipper,* and it compels our decision today." 512 U. S., at 164–165 (plurality opinion). Or that JUSTICE O'CONNOR quoted *Gardner* and *Skipper* for the proposition that "elemental due process" requires that a defendant must be allowed to answer a prosecutor's "prediction of future dangerousness" with "evidence on this point." 512 U. S., at 175 (internal quotation marks omitted).

Today, however, the Court seeks to revise the import of this line of cases. The first misstep in the Court's analysis is its treatment of *Gardner.* The majority makes much of the fact that the lead opinion was joined by only three Justices,[8] and instead of accepting the plurality's due process analysis as the rule of *Gardner,* the Court takes Justice White's concurring opinion, which was grounded in the Eighth Amendment, as expressing the holding of the case. The Court's reading of *Gardner* ignores the fact that Justice White himself squarely adopted the due process holding of

---

[8] The Court ignores the fact that Justice Brennan and Justice Marshall agreed with the plurality's conclusion that sentencing a defendant based on information he was not permitted to deny or explain violated due process, but refused to join the judgment insofar as it permitted further proceedings that could lead to another death sentence. See *Gardner* v. *Florida,* 430 U. S. 349, 364–365 (1977) (opinion of Brennan, J.); *id.,* at 365 (Marshall, J., dissenting).

*Gardner* in his opinion for the Court in *Skipper*. Although his opinion accepted Skipper's argument that the exclusion of evidence of his good behavior in prison at the sentencing hearing violated the Eighth Amendment requirement that the jury be allowed to consider all relevant mitigating evidence, Justice White went out of his way to add a footnote endorsing the *Gardner* plurality's statement of the law and emphasizing that this "elemental due process requirement" provided an even more basic justification for the Court's holding.[9] Moreover, in his opinion concurring in the judgment in *Skipper*, Justice Powell, joined by the Chief Justice and then-JUSTICE REHNQUIST, rejected the mitigating evidence rationale, relying instead on "the rule in *Gardner.*" 476 U. S., at 10–11. Thus, in *Skipper*, all nine Justices then serving on the Court endorsed *Gardner*'s holding that due process was violated when a sentencing determination rested on information that a defendant was not permitted to explain or deny. See also *Clemons* v. *Mississippi*, 494 U. S. 738, 746 (1990) (citing *Gardner* for the proposition that "[c]apital sentencing proceedings must of course satisfy the dictates of the Due Process Clause"); *Simmons*, 512 U. S., at 180 (SCALIA, J., dissenting) (quoting *Skipper* and *Gardner* as "indicat[ing] that petitioner's due process rights would be violated if he was 'sentenced to death "on the basis of information which he had no opportunity to deny or explain,"'" but concluding that the petitioner could not show that his sentence violated this principle).

---

[9] "Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* [v. *Ohio*, 438 U. S. 586 (1978),] and *Eddings* [v. *Oklahoma*, 455 U. S. 104 (1982),] that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.' *Gardner* v. *Florida*, 430 U. S. 349, 362 (1977)." *Skipper* v. *South Carolina*, 476 U. S. 1, 5, n. 1 (1986).

As to *Skipper*, the only distinction the majority is able to draw between that case and *Simmons* is that the defendant in *Skipper* sought to introduce "evidence of his past behavior," while Simmons wished "an opportunity to describe the extant legal regime." *Ante*, at 162. This distinction is simply not enough to make the rule in *Simmons* "new." In both cases, the prosecution was seeking to mislead the jury with an argument that excluded facts essential to the defendant's actual circumstances. The rule in *Skipper* and *Gardner*—that a defendant must be allowed an opportunity to rebut arguments put forward by the prosecution—simply cannot turn on whether his rebuttal relies on the fact that he is ineligible for parole or on the fact that he is a model prisoner.

The two cases on which the majority relies to argue that a reasonable jurist in 1988 would have thought that petitioner did not have a right to rebut the prosecutor's future dangerousness arguments simply provide further support for the conclusion that *Simmons* did not announce a new rule of law. In both *California* v. *Ramos*, 463 U. S. 992 (1983), and *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985), the Court focused its analysis on whether the information being presented (or withheld) in a sentencing determination permitted accurate and informed decisionmaking on the part of the sentencer.

In *Ramos*, the Court held that California's capital sentencing procedure—in which the judge was required to inform the jury that it could sentence the defendant to death or to life without parole, and then to provide the further instruction that the Governor could commute a life sentence without parole—was not constitutionally infirm. (This further instruction is, of course, only relevant when the jury has first been advised that the alternative to the death sentence is the option that was concealed from the jury in *Simmons* and in this case.) The Court correctly explained that the instruction on commutation of the life sentence was relevant

to the issue of future dangerousness, 463 U. S., at 1003, and consistent with the rule of *Gardner* because it provided the jury with accurate information and did not preclude the defendant from offering argument or evidence regarding the Governor's power to commute a life sentence. 463 U. S., at 1004. In a comment that anticipated the precise holding in *Simmons*, the Court concluded that the instruction under review "corrects a misconception and supplies the jury with accurate information for its deliberation in selecting an appropriate sentence." 463 U. S., at 1009.[10]

While the *Ramos* Court concluded that a State *could* constitutionally require trial judges to inform sentencing juries about the possibility of commutation of a life sentence, the Court did not hold that a State was constitutionally compelled to do so. The majority today, *ante*, at 163–164, suggests that the *Ramos* Court's endorsement of that option— involving a choice between two nonmisleading instructions, one mentioning and the other not mentioning the remote "possibility" of parole—might have led reasonable state judges to conclude that they could allow juries to be misled on the future dangerousness issue by concealing entirely the legal certainty of parole *impossibility*. But the general rule applied in *Ramos* simply permits state courts to give accurate instructions that will prevent juries from being misled about sentencing options in capital cases. In order to decide *Simmons* correctly, there was no need to "carv[e] out an exception," *ante*, at 166, from that rule.

The Court's reading of *Caldwell* is equally unpersuasive. In that case, the prosecutor had urged the jury not to view itself as finally determining whether the defendant would

---

[10] The Court cited with approval the provision of the Model Penal Code recommending that the jury be advised of "the nature of the sentence of imprisonment that may be imposed, including its implication with respect to possible release upon parole, if the jury verdict is against sentence of death." *California* v. *Ramos*, 463 U. S., at 1009, n. 23 (quoting American Law Institute, Model Penal Code § 210.6 (Prop. Off. Draft 1962)).

die, because the death sentence was subject to appellate review. As JUSTICE O'CONNOR's controlling opinion explained, the prosecutor's remarks were improper "because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility." 472 U. S., at 342. Because Justice Marshall's plurality opinion suggested that any comment on appellate review was "wholly irrelevant" to the sentencing determination, *id.*, at 336, the Court today suggests that state judges might reasonably have concluded "that information about postsentence procedures was *never* to go to the jury." *Ante*, at 165. Apart from the fact that an instruction describing a sentencing alternative does not relate to "postsentence procedures," I see no basis for assuming that concerns about describing the process of appellate review to a jury might have anything to do with the necessity for providing the jury with accurate information about sentencing options when the prosecutor makes the misleading argument that the death penalty is the only way to prevent a defendant's future dangerousness "outside of the prison system."

The Court has consistently, and appropriately, shown a particular concern for procedures that protect the accuracy of sentencing determinations in capital cases.[11] Today, the majority discards this concern when it relies on a nonexistent tension between *Gardner* and *Skipper* on the one hand and *Ramos* and *Caldwell* on the other to justify its refusal to apply the rule in *Simmons* to this case.

I respectfully dissent.

---

[11] See *Gardner*, 430 U. S., at 357–358 ("From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion"). See also, *e. g.*, *California* v. *Ramos*, 463 U. S. 992, 998–999 (1983); *Beck* v. *Alabama*, 447 U. S. 625, 637–638 (1980).