Present:  All the Justices

EVERETT LEE MUELLER

v.  Record No. 951874    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                        November 1, 1996
EDWARD W. MURRAY, DIRECTOR,
VIRGINIA DEPARTMENT OF
CORRECTIONS

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
William R. Shelton, Judge


Everett Lee Mueller was convicted by a jury of the capital murder, rape, and abduction of Charity Powers and sentenced to death.  We affirmed the judgment of the circuit court in Mueller v. Commonwealth, 244 Va. 386, 422 S.E.2d 380 (1992), cert. denied, 507 U.S. 1043 (1993).

Mueller filed a petition for habeas corpus in the circuit court alleging, among other things, that his federal and state constitutional rights were violated because "the sentencing jury was not allowed to know of his ineligibility for parole."  The circuit court dismissed the petition in part and denied it in part, and we awarded Mueller an appeal limited to that issue.

In considering this question, we determine whether Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187 (1994), announced a "new rule" within the meaning of Teague v. Lane, 489 U.S. 288 (1989).  We conclude that Simmons established a "new" rule that does not apply retroactively to Mueller's case.[1]

_____

[1]In addressing the merits of Mueller's due process claim, we reject the Commonwealth's argument that the claim is procedurally barred.  Mueller substantially raised the issue of his due process right to inform the jury of his parole ineligibility,

On the evening of October 5, 1990, Taryn Potts took her ten year old daughter, Charity Powers, to a skating rink. Potts had arranged to have a friend drive Charity home from the rink later that night, but the friend fell asleep and did not go to the rink. When Potts arrived home at 3:00 a.m. on October 6, 1990, and discovered that her friend had not brought Charity home, she immediately contacted the police, who initiated a search for her daughter.

Kevin H. Speeks, who knew Charity, testified that he saw her at a fast food restaurant near the skating rink at about 12:50 a.m. on October 6, 1990. While at the restaurant, Speeks also saw a man who appeared to be thirty years of age and of medium height, driving a cream-colored station wagon with wood siding through the parking lot several times. As Speeks left the restaurant, he saw the man standing on the right side of the building, and he also observed Charity sitting on a curb located on the same side of the building. Sergeant Mike Spraker of the Chesterfield County Police Department testified that Mueller customarily drove a cream-colored station wagon which had wood

(..continued)

based on the Commonwealth's argument of future dangerousness, at trial and on direct appeal. (See Appendix from Record Nos. 920287 and 920449, at 93, 319-22, 1260-62, and pp. 38-40 of Mueller's brief on direct appeal to this Court.)

siding.

When Mueller spoke with the police on October 8 and 9, 1990, he admitted that he had talked to a young female on October 5, 1990, at a fast food restaurant that might have been near the skating rink. Based on information gained over the course of their investigation, the police searched the area near Mueller's home. On February 8, 1991, they found "a clump of hair and what looked like some white bone sticking out of the ground." As a result of this discovery, the police exhumed Charity's body, which had been buried about 900 feet behind Mueller's house. The police found a knife stuck in the ground about 174 feet from the grave.

The police arrested Mueller on February 12, 1991, and advised him of his Miranda rights. During an interrogation, Mueller confessed to the crime. He stated that he had agreed to give Charity a ride home from the restaurant but that he drove her to his house instead.

Mueller said that he thought Charity was 18 or 19 years old. Charity was about 4'8" tall and weighed 90 pounds. Mueller told the police that Charity agreed to have sex with him, and that he took her to the woods behind his house where he had sexual intercourse with her. He stated that, although he had a knife nearby, he did not use it.

Mueller told the police that he strangled Charity to death because he was afraid that she would report the incident. He

later purchased a shovel from a local store, buried her body, and burned her clothes and jewelry.  After making this confession, Mueller showed the police the area where he had buried the body, as well as the locations where he had raped her and had left the knife.

The medical examiner who conducted an autopsy on Charity's body testified that Charity's throat had been cut to the depth of one inch, resulting in a horizontal cut on the epiglottis.  She stated that such a cut would result in the severance of the carotid artery and the jugular vein.  According to the medical examiner, a person suffering from such an injury would die after several minutes, and there were indications that Charity had bled before her death.  Based on these facts, the medical examiner concluded that the cause of death was "acute neck injury."

The medical examiner also stated that, on examining the skin over the breast area, there were "irregular holes in the area where each nipple would be."  The medical examiner also observed a "big gash" on the victim's upper left thigh.  She also determined that there were three tears to the hymenal ring of the vagina which were consistent with sexual penetration.

At the conclusion of this phase of the bifurcated trial, the jury found Mueller guilty of capital murder in violation of Code § 18.2-31(5) and former Code § 18.2-31(8)[2] (murder in the

_____

[2]Former Code § 18.2-31(8) was replaced by Code § 18.2-31(1), which includes in the definition of capital murder "[t]he

- 4 -

commission of a rape, and murder of a child under 12 in the commission of an abduction).  The jury also convicted Mueller of rape and abduction with intent to defile, and it fixed his punishment at life imprisonment on both these charges.

At the penalty phase of the trial, each of four women, including Mueller's sister, testified that Mueller had raped her at knife point.  Two of these rapes resulted in criminal convictions.  Mueller's expert, Dr. Mariah Travis, a clinical psychologist, acknowledged that Mueller did not have "a working conscience," and that he had "graduated to . . . a new and even more dangerous level."

Mueller testified during the penalty phase.  When asked whether he felt any remorse for having raped one particular victim, Mueller replied, "Which one is that?  Ha, ha."  On completing his testimony, Mueller stated, "Get this God damn shit over with so that I can go smoke a cigarette."

At the conclusion of the penalty phase evidence, the jury fixed Mueller's punishment for capital murder at death, based on findings of both vileness and future dangerousness.  After the
(..continued)
willful, deliberate, and premeditated killing of any person in the commission of abduction, as defined in Code § 18.2-48, when such abduction was committed with the intent to extort money or a pecuniary benefit or with the intent to defile the victim of such abduction."

hearing required by Code § 19.2-264.5, the trial court imposed the sentences fixed by the jury.

## II.

In this appeal, Mueller argues that his death sentence should be set aside because the trial court did not allow him to inform the jury that he was ineligible for parole under Code § 53.1-151(B1). That section provides in part that "[a]ny person convicted of three separate felony offenses of (i) murder, (ii) rape or (iii) robbery by the presenting of firearms or other deadly weapon . . . shall not be eligible for parole."

In support of his argument, Mueller relies on Simmons, in which the Supreme Court held that, when the prosecution seeks the death sentence based on the defendant's future dangerousness, and the only alternative sentence is life imprisonment without the possibility of parole, the defendant has a due process right to inform the jury that he is parole ineligible. 512 U.S. at ___, 114 S.Ct. at 2196. Mueller contends that, under Simmons, the trial court's ruling denied him due process because he was not able to rebut the Commonwealth's argument of future dangerousness with evidence of his parole ineligibility.

Mueller asserts that the rule articulated in Simmons is not a "new" rule, because it was compelled by two United States Supreme Court decisions in effect at the time of his trial and direct appeal, Gardner v. Florida, 430 U.S. 349 (1977), and Skipper v. South Carolina, 476 U.S. 1 (1986). Thus, Mueller

argues that the rule in <u>Simmons</u> applies retroactively to his case.  We disagree.

III.

In <u>Teague v. Lane</u>, 489 U.S. 288, the Supreme Court stated that, on habeas corpus review, constitutional error must be evaluated together with the interests of comity and finality. <u>Id.</u> at 308.  Based on these multiple considerations, a Supreme Court decision articulating a "new" constitutional rule of criminal procedure generally will not be applied to a conviction which has become final before the rule is announced.  <u>Id.</u> at 310.

"[A] case announces a 'new' rule if the result was not dictated by precedent existing at the time the defendant's conviction became final."  <u>Id.</u> at 301.  Since Mueller seeks the benefit of a rule articulated after his conviction became final on direct appeal, this Court must first determine whether <u>Simmons</u> announced a "new" rule under <u>Teague</u> before considering the merits of Mueller's claim.  <u>See</u> <u>Caspari v. Bohlen</u>, 510 U.S. 383, 390 (1994); <u>O'Dell v. Netherland</u>, ___ F.3d ___, ___ (4th Cir. 1996) (Slip Op. at 7).

The <u>Teague</u> analysis requires three steps.  First, the reviewing court must determine the date on which the defendant's conviction became final for retroactivity purposes.  <u>Caspari</u>, 510 U.S. at 390.  Second, the reviewing court must "survey the legal landscape" as it existed on the date the defendant's conviction became final to determine whether existing constitutional

- 7 -

precedent compelled the conclusion which the defendant sought. Id. Third, if the reviewing court determines that the defendant seeks the benefit of a "new" rule, the court "must decide whether that rule falls within one of the two narrow exceptions to the nonretroactivity principle." Id.

                                    IV.

"A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." Id. We determine the date on which Mueller's convictions became final by the date the United States Supreme Court denied a rehearing on his petition for certiorari on direct review of his conviction and death sentence. See Penry v. Lynaugh, 492 U.S. 302, 314 (1989). Thus, Mueller's convictions became final for retroactivity purposes on June 7, 1993. See Mueller v. Virginia, 507 U.S. 1043 (1993).

We next consider whether existing precedent compelled the conclusion advanced by Mueller. A rule is not compelled by existing precedent if those decisions merely inform or control the analysis of the petitioner's claim. Saffle v. Parks, 494 U.S. 484, 491 (1990). Rather, a rule is compelled by existing precedent only if a contrary conclusion would have been objectively unreasonable. O'Dell, ___ F.3d at ___ (Slip Op. at 12). Thus, as the Supreme Court explained in Butler v. McKellar,

494 U.S. 407 (1990), "[t]he 'new rule' principle . . . validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." Id. at 414.

For purposes of "new" rule analysis, the scope of the rule under examination is defined as the narrowest principle of law actually applied to resolve the issue presented. O'Dell, ___ F.3d at ___ (Slip Op. at 11). Thus, the "rule" of Simmons is "that 'where the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without parole, due process entitles the defendant to inform the capital sentencing jury -- by either argument or instruction -- that he is parole ineligible.'" Townes v. Murray, 68 F.3d 840, 850 (4th Cir. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 831 (1996) (quoting Simmons, 512 U.S. at ___, 114 S.Ct. at 2201).

In June 1993, when Mueller's conviction became final, the "legal landscape" contemplated by Teague included the principal cases on which Simmons relied, Gardner and Skipper. In Gardner, the defendant was convicted of first degree murder, and the jury recommended that he receive a life sentence. However, the trial court sentenced the defendant to death, relying on a confidential presentence report that the defendant did not have an opportunity to see or rebut. 430 U.S. at 353.

The Supreme Court vacated the defendant's death sentence,

- 9 -

holding that the defendant's constitutional rights were violated by use of the secret report.  The three-justice plurality concluded that the sentencer's use of the report denied the defendant due process, id. at 362, while the two justices concurring in the judgment based their decision on Eighth Amendment grounds.  Id. at 363-64.

In Skipper, the trial court denied the defendant the right to present the jury with evidence of his good behavior during the seven months he spent in jail awaiting trial.  476 U.S. at 4. The Supreme Court held that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating," and that under Eddings v. Oklahoma, 455 U.S. 104 (1982), exclusion of such relevant evidence from the sentencer's consideration violates the Eighth Amendment. Skipper, 476 U.S. at 5; see also Eddings, 455 U.S. at 112-13.

Skipper also addressed the defendant's right of due process in a footnote, stating that

> [w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of Lockett [v. Ohio, 438 U.S. 586 (1978)] and Eddings that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain." Gardner v. Florida, 430 U.S. 349, 362 (1977).

Id. at 5 n.1.

In addition to Gardner and Skipper, the "legal landscape" of 1993 included California v. Ramos, 463 U.S. 992 (1983), in which

the trial court, as required by state law, instructed the jury that a sentence of life imprisonment without parole may be commuted by the Governor to a sentence providing the possibility of parole.  Id. at 995-96.  The defendant argued that basic fairness entitled him to inform the jury that the Governor also could commute a death sentence, so the jury would not have the mistaken impression that it could guarantee the defendant's permanent removal from society by imposing the death sentence. Id. at 1010-11.

The Supreme Court held that the Eighth and Fourteenth Amendments did not entitle the defendant to inform the jury of the Governor's power to commute a death sentence.  In explaining its holding, the Court specifically stated that the challenged procedure did not violate the due process rule of Gardner.  Id. at 1001.  The Court also emphasized the deference given a state's determination regarding what sentencing information the jury will receive.  The Court stated,

> [W]e defer to the State's identification of the Governor's power to commute a life sentence as a substantive factor to be presented for the sentencing jury's consideration.
>
> Our conclusion is not intended to override the contrary judgment of state legislatures that capital sentencing juries in their States should not be permitted to consider the Governor's power to commute a sentence . . . .  We sit as judges, not as legislators, and the wisdom of the decision to permit juror consideration of possible commutation is best left to the States.

Id. at 1013-14 (footnote omitted) (emphasis added).  Moreover, in

stating this principle of broad deference, the Court noted, with apparent approval, that "[m]any state courts have held it improper for the jury to consider or to be informed -- through argument or instruction -- of the possibility of commutation, pardon, <u>or parole</u>."  <u>Id.</u> at 1013 n.30 (emphasis added).

V.

The precise issue before us, whether the rule in <u>Simmons</u> was compelled by <u>Gardner</u>, <u>Skipper</u>, and <u>Ramos</u>, was considered in <u>O'Dell</u> by the United States Court of Appeals for the Fourth Circuit, sitting <u>en</u> <u>banc</u>.  The defendant in <u>O'Dell</u>, like Mueller, was convicted in Virginia of capital murder and sentenced to death by a jury that was not informed of his parole ineligibility.  O'Dell argued, among other things, that <u>Simmons</u> did not announce a "new" rule and, thus, that <u>Simmons</u> applied retroactively to his case, mandating the reversal of his death sentence.

The Court of Appeals disagreed, holding that <u>Simmons</u> articulated a "new" rule.  The Court stated that, prior to <u>Simmons</u>, a reasonable jurist could have concluded under <u>Ramos</u> that the Constitution left to the states the decision whether to instruct the jury on the defendant's parole ineligibility. <u>O'Dell,</u> ___ F.3d at ___ (Slip Op. at 30).

The Court further stated that a jurist reasonably could have distinguished the rule of <u>Gardner</u> and <u>Skipper</u> regarding the defendant's right to rebut prosecution claims with <u>factual</u>

- 12 -

evidence, from the rule in Ramos regarding the defendant's right to rebut prosecution claims with arguments from state law. Id. at ___ (Slip Op. at 29). The Court explained that this distinction was reasonable prior to Simmons, because "relevant factual information, like secret sentencing reports or prior good behavior, cannot change with time, but a state's legal standards and post-conviction procedures, like eligibility for commutation or parole can always change long after the sentencing jury renders its verdict." Id. at ___ (Slip Op. at 31-32) (citation omitted). We agree with the Court of Appeals' analysis.

In Mueller's direct appeal, this Court explicitly relied on

Ramos in rejecting Mueller's due process argument, stating that
> Mueller argues that the trial court violated his due process rights by refusing to instruct the jury that, pursuant to Code § 53.1-151(B1), he would not be eligible for parole . . . . We hold that the trial court did not err in its rulings here. This Court has held uniformly and repeatedly that information regarding parole eligibility is not relevant for the jury's consideration. Further, the United States Supreme Court has expressly left the determination of this question to the individual states, as a matter of state law. California v. Ramos, 463 U.S. 992, 1013-14 (1983).

Mueller, 244 Va. at 408-09, 422 S.E.2d at 394 (emphasis added) (citations omitted).

Prior to Simmons, reliance on Ramos was objectively reasonable for the proposition that the Constitution permitted the states to decide whether to inform a capital sentencing jury of a defendant's parole ineligibility. The argument rejected by the Court in Ramos was, in principle, the same argument

- 13 -

successfully advanced in Simmons, that the defendant was entitled to inform the sentencing jury whether the death sentence was the only option that would insure the defendant would never return to society.

Before Simmons, the Supreme Court had never held that a defendant had a due process right to rebut prosecution arguments of future dangerousness with evidence that was unrelated to the defendant's character and crime. O'Dell, ___ F.3d at ___ (Slip Op. at 32). Moreover, the decision in Skipper did not address Ramos or its rationale of giving broad deference to the states in determining the information that should be given a capital sentencing jury. Thus, we conclude that Simmons announced a "new" rule within the meaning of Teague.

VI.

Having concluded that reliance on Ramos was objectively reasonable and, thus, that Simmons announced a "new" rule, we turn to the third and final step in the Teague analysis, assessing whether the "new" rule of Simmons falls within one of the two narrow exceptions to the nonretroactivity principle. See Caspari, 510 U.S. at 390. The first exception applies to a rule that places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." Teague, 489 U.S. at 307 (citation omitted). This exception is inapplicable here, because Simmons does not place any conduct outside the scope of the criminal law, nor does it

- 14 -

shield a particular class of persons from the imposition of the death penalty.  See O'Dell, ___ F.3d at ___ (Slip Op. at 40).

The second exception under Teague applies only to "watershed" rules of criminal procedure, which are so fundamental that they are "implicit in the concept of ordered liberty." Teague, 489 U.S. at 311 (citations omitted).  An often-cited example of such a rule is Gideon v. Wainwright, 372 U.S. 335 (1963).  See Saffle, 494 U.S. at 495.  We do not believe that the rule in Simmons is such a groundbreaking rule "implicit in the concept of ordered liberty."  See Teague, 489 U.S. at 311.  Thus, since the rule in Simmons does not fall within either Teague exception, the rule is not applicable retroactively to Mueller's case.[3]

## VII.

Mueller advances two additional arguments, stating that the trial court's refusal to allow him to inform the jury of his parole ineligibility (1) violated his Eighth Amendment rights, and (2) violated his right under Article I, Section 8 of the Virginia Constitution "to call for evidence in his favor." However, we hold that these arguments are procedurally barred,

_____

[3]Mueller also argues that his due process rights under Article I, Section 11 of the Virginia Constitution were violated, because the jury was not informed of his parole ineligibility. We reject this claim under the analysis detailed above.

because Mueller did not raise them on direct appeal.  See <u>Slayton</u> <u>v. Parrigan</u>, 215 Va. 27, 30, 205 S.E.2d 680, 682 (1974), <u>cert.</u> <u>denied sub nom.</u> <u>Parrigan v. Paderick</u>, 419 U.S. 1108 (1975).[4]

For these reasons, we will affirm the trial court's judgment.

<u>Affirmed.</u>

---

[4]We also do not consider Mueller's arguments that he received ineffective assistance of counsel and that his rights under Code §§ 19.2-264.2 and -264.4 were violated, when he was not allowed to inform the jury of his parole ineligibility. These arguments are outside the scope of the appeal awarded in this case.