COURT OF APPEALS OF VIRGINIA


Present: Judges Elder, Annunziata and Frank
Argued by teleconference


DAVID LEE HILLS
                                          OPINION BY
v.    Record No. 0367-99-4    JUDGE ROSEMARIE ANNUNZIATA
                                        SEPTEMBER 26, 2000
COMMONWEALTH OF VIRGINIA


UPON A REHEARING

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Marcus D. Williams, Judge

        Peter D. Greenspun (Vladimir I. Arezina;
        Peter D. Greenspun & Associates, P.C., on
        brief), for appellant.

        Leah A. Darron, Assistant Attorney General
        (Mark L. Earley, Attorney General, on
        brief), for appellee.


    David Lee Hills appeals from his conviction of rape.  He

contends:  1) the trial court erred in allowing an expert

witness' testimony based upon statistical data relating to DNA

evidence; 2) that DNA evidence offered by the Commonwealth

should not have been admitted because he was not given proper

notice of the Commonwealth's intent to proffer this evidence; 3)

the trial court erred in denying his motions to strike the

Commonwealth's evidence at the close of the trial, and to set

aside the conviction, because the evidence at trial was

insufficient to support the verdict; 4) that the trial court

erroneously denied his post-trial Brady v. Maryland motion;

5) the trial court erred by admitting blood analysis results into evidence without an adequate showing of chain of custody; and 6) that the trial court erred in refusing to instruct the jury that parole has been abolished in Virginia and in precluding inquiry during voir dire on the same issue. We affirm with respect to the first five issues, but find that the trial court erred in refusing to instruct the jury and allow voir dire on the subject of abolition of parole. For the reasons stated herein, we reverse and remand for resentencing.

## FACTS

"On appeal, we view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom." Hunley v. Commonwealth, 30 Va. App. 556, 559, 518 S.E.2d 347, 349 (1999). On November 7, 1997, Patricia McKendry began drinking beer at approximately 11:30 a.m. in her home in Fairfax, Virginia. Her birthday was two days away, and she planned to go out for the evening to celebrate. By the time she left her apartment at 7:00 p.m., she had consumed nine beers. She went to P.J. Skidoo's, a nearby bar, to continue celebrating her birthday. She was a frequent customer of P.J. Skidoo's and was known by sight to the bar's doorman.

McKendry spent the evening playing darts and talking with a number of the bar's patrons. One of the people she encountered

was the defendant, David Hills, who was also a regular customer there.  McKendry and Hills conversed at the bar between 7:30 p.m. and 8:00 p.m., and, during this time, Hills bought McKendry a drink.  The bartender, Todd Doty, realized after he served the drink to McKendry that she was extremely intoxicated, and he told the other bartenders not to serve any more alcohol to her.  Doty also reported McKendry's intoxication to the bar's general manager, Dimitri Paraskevopoulos, who told one of the doormen, John Brobst, to ask her to leave.  As Brobst approached McKendry to do so, he observed her putting on her coat and, surmising that she was leaving of her own accord, decided not to speak to her.

Paraskevopoulos and Brobst both saw McKendry leave the bar, and they each saw Hills leave within a few moments of McKendry's departure.  Brobst observed Hills approach McKendry as she stood beneath the awning of a nearby furniture store, taking shelter from the rain.  Brobst watched as they conversed but did not overhear their conversation.  He then saw them walk together down the alleyway between P.J. Skidoo's and the furniture store, toward the parking lot behind the bar, where they got into a white car which Hills drove.  Hills and McKendry remained inside the car with the engine running for several minutes before they left.

McKendry testified that Hills approached her as she stood under the store's awning and that he offered her a ride home. She accepted the offer, and the two walked to Hills' car parked in the lot behind the bar. After they left the parking lot and traveled a short distance on Lee Highway, McKendry realized they were traveling in the opposite direction from her apartment. McKendry protested that they were going in the wrong direction, but Hills continued to drive, eventually proceeding southbound on Route 123. After proceeding south for several miles on Route 123, Hills turned left at Burke Centre Parkway, then into the parking lot of a shopping center, parking the car in the loading area in the back. McKendry asked Hills why they were there, and Hills replied, "[y]ou know what we're doing here." Hills began to play with McKendry's hair. McKendry protested, "[t]hat ain't what we're doing, I don't do things like that," and said she wanted to go home. Hills then reached across to the passenger side door, unlatched it, and kicked McKendry on the side, saying, "[g]et the f--- out." The kick knocked McKendry out of the car.

Hills walked around the car to where McKendry lay, grabbed her by her jacket, and dragged her toward a wooded area near the shopping center's loading dock. Hills stopped near a chain link fence in the patch of woods and placed McKendry against the fence. He pulled her blouse and bra over her head, and pulled

- 4 -

down her pants and undergarments, ripping her pants as he did so.  Hills then grabbed McKendry's left breast with his hand and forcibly had intercourse with her.  McKendry did not consent to the intercourse.  McKendry cursed and yelled at Hills to stop and struck him on the head with her hands.  After a few moments, Hills ceased the attack and fled, leaving McKendry lying by the fence.

McKendry took several minutes to recover from the assault sufficiently to try to put on her clothing and look for help. She walked out of the woods into the shopping center parking lot, and, seeing that Hills' car was gone, she walked toward Route 123, hoping to find a way home.  She saw a police car parked nearby and approached it.  Two police officers were in the car, and, seeing her approach, they exited their vehicle and asked if she needed assistance.  She told them she had just been raped.

One of the police officers was Mark Gleason, a five-year veteran of the Fairfax County Police.  Gleason testified that when he saw McKendry approach his police cruiser it was approximately 10:00 p.m., and he could see that McKendry's bra was up over her neck and her sweater was torn.  Her breasts were exposed, and they exhibited red marks.  Her pants were ripped, leaving her groin area exposed.  When McKendry reported she had been raped, Gleason informed his supervisor of her account and

requested that a K-9 unit respond to the scene. Gleason asked McKendry for a description of the attacker, and, after the K-9 unit arrived, he and other officers set out to investigate. After unsuccessfully searching for the crime scene, Gleason transported McKendry to Fairfax Hospital, where she was examined by sexual assault nurse examiner Suzanne Brown. Brown found five bruises consistent with the impression of fingers on McKendry's left breast, and she noted severe redness and swelling in McKendry's vagina, including abrasions on the labia. Brown used a physical evidence recovery kit ("PERK") to swab McKendry's body, and she took a blood sample from her. Brown sealed the results of the PERK examination and gave them and the blood sample to Detective Joanne Studer, a sexual assault investigator with the Fairfax County police. Detective Studer took the sealed evidence to the state crime lab on Braddock Road and gave it to a representative of the lab, who signed for it.

On November 19, 1998, Hills was tried before a jury on the charge of rape. Hills objected to the admission of the test results derived from McKendry's PERK examination and blood samples, as well as to the results of a blood test performed on Hills' blood, on the ground the Commonwealth had failed to establish that the individual who signed for this evidence at the state forensic lab was authorized to do so. Hills also objected to the testimony of Mary McDonald, a DNA examiner with

the Virginia Division of Forensic Science, who received McKendry's PERK kit and blood sample and the blood sample taken from Hills.  McDonald testified that her analysis of the DNA recovered from a swab of McKendry's left breast indicated Hills could not be ruled out as a contributor.  She further testified that it was 330 times more likely that this DNA came from Hills than from another, randomly selected, Caucasian person.  Hills objected to McDonald's testimony on the grounds that she did not prepare the statistical database she used to arrive at her conclusions and that her testimony violated Code § 19.2-270.5 because the Commonwealth failed to give Hills adequate notice of her testimony.  The court overruled these objections.

Leanne Hooper, a forensic DNA analyst with Cellmark Diagnostic Laboratory in Montgomery County, Maryland, testified for the defense.  Hooper opined that the DNA analysis results were inconclusive as to whether Hills could be a contributor of the DNA recovered from McKendry, because Hills' alleles were not present in the STR portion of the test results.  Hooper testified that the types of alleles present in the DNA sample tested were consistent with McKendry's alleles, but not with those of Hills.  Hooper also opined that no conclusion concerning the statistical probability of the DNA sample matching Hills' DNA could be made because of the inconclusive nature of the test results and the small amount of DNA tested.

Detective Joanne Studer, who investigated the case, testified as a defense witness. She stated that when she called McKendry two days after the attack to confirm a meeting, McKendry told her, "[m]y story is going to change, I was f---ed up." Hills cited this admission by his accuser as one of the bases for his motion to strike the Commonwealth's evidence and for his later motions to set aside the verdict.

Dr. James Valentour, chief forensic toxicologist for the Commonwealth's Division of Forensic Science, also testified for the defense. Dr. Valentour opined that McKendry would have had to have consumed twice the amount of alcohol she admitted to having consumed on the date in question in order for her blood alcohol level to reach .26%, the level of intoxication indicated by her blood test following the attack. Hills cites the discrepancy between Dr. Valentour's testimony and that of McKendry in regard to the amount of alcohol she had consumed as evidence her memory of the rape and her identification of him as her attacker were unreliable because of her intoxication.

On November 20, 1998, after three days of deliberations, the jury found Hills guilty of rape and sentenced him to six years in prison. On January 22, 1999, the court issued an order of final judgment in accord with the jury's verdict and sentence. This appeal followed.

- 8 -

ADMISSIBILITY OF DNA ANALYSIS

Hills contends that Mary McDonald's testimony based upon a statistical database compiled and maintained by the Commonwealth's forensic laboratory in Richmond was erroneously admitted into evidence, because McDonald took no part in its compilation or maintenance and had no first-hand knowledge of it. For the reasons which follow, we find the court did not err in admitting the challenged testimony.

## A.  Alleged procedural bar

The Commonwealth first contends Hills' argument is procedurally barred. The Commonwealth argues that when a defendant utilizes DNA test results offered by the Commonwealth to his or her own advantage during the presentation of the defense, he or she waives any objection to the admissibility of that evidence. The Commonwealth cites Hubbard v. Commonwealth, 243 Va. 1, 413 S.E.2d 875 (1992), for the proposition that "'[w]here an accused unsuccessfully objects to evidence which he considers improper and then on his own behalf introduces evidence of the same character, he thereby waives his objection and [the appellate court] cannot reverse for the alleged error.'"  243 Va. at 9, 413 S.E.2d at 879 (quoting Saunders v. Commonwealth, 211 Va. 399, 401, 177 S.E.2d 637, 638 (1970)). The Commonwealth contends that Hills, through the testimony of DNA analyst Leanne Hooper, utilized the DNA test results,

derived from comparison with the challenged database, in presenting his case. Thus, under the holding of Hubbard, the Commonwealth argues that Hills is precluded from contesting the admissibility of evidence which he used on his own behalf. We disagree with the Commonwealth's characterization of Hooper's testimony.

Hills objected to McDonald's analysis of the DNA and blood samples taken from McKendry on the ground she utilized a statistical database that was not entered into evidence in reaching her conclusions. In contrast, Hooper's testimony was limited to a critique of McDonald's analysis, and she testified that she did not perform any DNA analysis in this case. Furthermore, the trial judge specifically noted that Hooper did "not analyz[e] a DNA sample . . . [but rather] remark[ed] on the results of the analysis that [the Commonwealth's] witness ha[d] given." We, therefore, conclude that Hills did not introduce evidence "of the same character" as the DNA evidence offered by the Commonwealth through the testimony of Mary McDonald, but was instead simply challenging the conclusions McDonald reached in her analysis. Hills is, therefore, not procedurally barred from making his claim on appeal.

### B. Admissibility of expert testimony based upon data not in evidence

Hills contends that Mary McDonald's testimony, discussing her reliance on the DNA database compiled and maintained by the

- 10 -

Department of Forensic Science when performing her analysis of the DNA samples taken from McKendry, included references to the database that constituted inadmissible hearsay. Hills argues that McDonald's testimony was, therefore, inadmissible without introduction of the database upon which her analysis was based. His claim is without merit.

"[T]he principal rationale underlying the hearsay rule [is] that of reliability . . . ." King v. Commonwealth, 18 Va. App. 57, 59, 441 S.E.2d 704, 705 (1994) (citation omitted). It is well settled that the legislature may "exonerat[e] . . . otherwise hearsay [evidence] from the application of the Hearsay Rule, thus making that [evidence] admissible." Basfield v. Commonwealth, 11 Va. App. 122, 124, 398 S.E.2d 80, 81 (1990). The legislature has established such an exception to the hearsay rule with respect to DNA evidence.

Code § 19.2-270.5 is a rule of evidence which provides, in pertinent part: "[i]n any criminal proceeding, DNA . . . testing shall be deemed to be a reliable scientific technique and the evidence of a DNA profile comparison may be admitted to prove or disprove the identity of any person." The statute's clear import is the admissibility of DNA testing, with all its constituent parts, which necessarily involves and includes a DNA profile comparison. Its admissibility is based on a legislative determination that the database used to perform the testing is

presumptively reliable.  See Evans-Smith v. Commonwealth, 5 Va. App. 188, 199, 361 S.E.2d 436, 442 (1987) ("The rationale for allowing hearsay [is] the inherent reliability of the statement . . . .").  It is thus implicit in the statutory language that testimony regarding the results of the DNA testing is admissible, notwithstanding the nature of the database used to perform the comparative analysis portion of the test.[1]

Furthermore, such evidence is admissible under the principles established in Virginia case law.  In Funderburk v. Commonwealth, 6 Va. App. 334, 368 S.E.2d 290 (1988), we addressed the admissibility of an expert's testimony concerning her blood serology analysis, which was based upon the expert's use of studies not admitted into evidence to arrive at a statistical prevalence evaluation of the victim's blood type in the general population.  Although generally an expert witness must base his or her opinion only on facts in evidence, see Simpson v. Commonwealth, 227 Va. 557, 565, 318 S.E.2d 386, 391 (1984), we held that an exception exists for expert testimony concerning information not specifically prepared for the case at hand and which is of a type "customarily relied upon and consulted by those in [the expert witness'] field."  Funderburk,

---

[1] Although the statute excludes objections to the analysis based on hearsay, nothing in the statute precludes a challenge by the opposing party to the "accuracy and reliability of the procedures employed in the collection and analysis of a particular DNA sample."  Code § 19.2-270.5 (emphasis added).

- 12 -

6 Va. App. at 338, 368 S.E.2d at 292. "Such information and knowledge [was] within the expertise of the [witness] and the court did not err to admit her testimony when the studies or tables [were] not in evidence or not identified." Id. (citing Missouri v. Onken, 701 S.W.2d 518, 522 (Mo. App. 1985)); see also Kern v. Commonwealth, 2 Va. App. 84, 87, 341 S.E.2d 397, 399 (1986) (jewelry appraiser's testimony concerning market value of gemstone was properly admitted, although expert relied on market data brochure not admitted into evidence; because brochure "was not prepared for the sole purpose of arriving at a specific opinion at issue in [the] case," the general rule did not apply).

In this case, the forensic science DNA database utilized to prepare the analysis was not prepared specifically for Hills' prosecution, and it was of a type generally relied upon by DNA analysts. McDonald's testimony was, therefore, properly admitted.

<u>ADEQUACY OF NOTICE OF INTENT TO OFFER DNA EVIDENCE</u>

Hills further contends the notice sent to him on June 16, 1998 by the Commonwealth, which stated that DNA evidence would be introduced against him at trial, failed to adequately notify him of the character and content of the testimony to be given by Mary McDonald, and this failure violated the requirements of Code § 19.2-270.5. We disagree.

- 13 -

Code § 19.2-270.5 provides, in pertinent part:

> At least twenty-one days prior to
> commencement of the proceeding in which the
> results of a DNA analysis will be offered as
> evidence, the party intending to offer the
> evidence shall notify the opposing party, in
> writing, of the intent to offer the analysis
> and shall provide or make available copies
> of the profiles and the report or statement
> to be introduced.  In the event that such
> notice is not given, and the person proffers
> such evidence, then the court may in its
> discretion either allow the opposing party a
> continuance or, under appropriate
> circumstances, bar the person from
> presenting such evidence.

A certificate of analysis was prepared by McDonald on March 16, 1998, and she produced a supplemental report on September 1, 1998, a copy of which was immediately provided to defense counsel.  The supplemental report included McDonald's conclusion that Hills was 330 times more likely to have contributed the DNA recovered from McKendry than another, randomly selected Caucasian.  By letter dated June 16, 1998, the Commonwealth notified Hills' counsel of its intent to introduce DNA evidence. At that time, trial was scheduled for July 7, 1998, but was later continued until September 22, 1998.  Thus, both the June 16, 1998 letter and the September 1, 1998 supplemental report were received by Hills at least twenty-one days before the scheduled trial dates.  The statutory time requirement for notice of DNA evidence was, therefore, met.

Hills argues, however, that although he received the supplemental report twenty-one days prior to his trial, he was not given "notice" that this report would be offered as evidence. We disagree. Code § 19.2-270.5 provides: "At least twenty-one days prior to commencement of the proceeding in which the results of a DNA analysis will be offered as evidence, the party intending to offer the evidence shall notify opposing counsel, in writing, of the intent to offer the analysis . . . ." (Emphasis added). By letter dated June 16, 1998, the Commonwealth provided Hills with such notice of intent. The supplemental report prepared by McDonald constituted additional analysis of the DNA evidence in question, not an analysis of new evidence requiring additional notice to Hills. The supplemental report merely completed the summary of the analysis contained in McDonald's report of March 16, 1998. On June 16, 1998, well in advance of his trial, Hills received the notice required by statute. The court thus properly admitted the supplemental report.

### SUFFICIENCY OF THE EVIDENCE

Hills further contends the evidence admitted against him at trial failed to prove his guilt beyond a reasonable doubt. This challenge is based primarily on the credibility of the complaining witness. He cites McKendry's extreme state of inebriation at the time of her attack and the presence of trace

amounts of PCP in her blood stream at that time, as demonstrating the unreliability of her memory of the attack.[2] His argument is without merit.

"In reviewing the sufficiency of the evidence, we consider the record 'in the light most favorable to the Commonwealth, giving it all reasonable inferences deducible therefrom.'" DeAmicis v. Commonwealth, 31 Va. App. 437, 440, 524 S.E.2d 151, 152 (2000) (quoting Watkins v. Commonwealth, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998)). "'An appellate court must discard all evidence of the accused that conflicts with that of the Commonwealth . . . .'" Id. (quoting Lea v. Commonwealth, 16 Va. App. 300, 303, 429 S.E.2d 477, 479 (1993)). The credibility of witnesses and the weight assigned their testimony are matters exclusively for the jury. See Lynn v. Commonwealth, 27 Va. App. 336, 351, 499 S.E.2d 1, 8 (1998). "This Court does not substitute its judgment for that of the trier of fact." Hunley, 30 Va. App. at 559, 518 S.E.2d at 349 (citing Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220 (1992)). A "jury [is] entitled to disbelieve [an] appellant's self-serving

---

[2] Hills also cites the testimony of defense witness Dr. James Valentour, chief forensic toxicologist for the Commonwealth's Division of Forensic Science, who testified that McKendry would have had to have consumed twice the amount of alcohol she admitted to having consumed on the date in question in order for her blood alcohol level to reach .26%, the level of intoxication indicated by her blood test following the attack. Hills cites this discrepancy between McKendry's testimony and that of Dr. Valentour as impeaching McKendry's credibility.

testimony and to conclude that he was lying to conceal his guilt." Price v. Commonwealth, 18 Va. App. 760, 768, 446 S.E.2d 642, 647 (1994). The jury's verdict may not be disturbed unless it is plainly wrong or without evidence to support it. See Lynn, 27 Va. App. at 351, 499 S.E.2d at 8 (citing Traverso v. Commonwealth, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988)).

The jury's verdict in this case is fully supported by evidence in the record and is not plainly wrong. McKendry testified to her encounter with Hills at P.J. Skidoo's and to Hills' offer to drive her home from the bar. She testified to the attack that ensued, including specific details, such as the location and discrete acts committed by Hills in the course of raping her and Hills' action in kicking her out of the parked car. The jury was able to assess McKendry's credibility as she testified and took its assessment of her into account in reaching its verdict, including the evidence offered of her inebriation on the evening in question. Because we "do[ ] not substitute [our] judgment for that of the trier of fact," Hunley, 30 Va. App. at 559, 518 S.E.2d at 349, we cannot say the jury's assessment of McKendry's credibility was plainly wrong.

McKendry's account of the events of the evening which culminated in the rape was corroborated by the testimony of other witnesses. Dimitri Paraskevopoulos and John Brobst saw Hills leave the bar soon after McKendry, and Brobst saw Hills

approach McKendry and engage her in conversation outside the bar.  He also reported seeing McKendry go to Hills' car with him.  Witnesses Kathleen Gregg, Kathy Rosnick, and Dennis Stubbs saw Hills and McKendry leave the bar within minutes of each other, and all three confirmed that McKendry and Hills had conversed at the bar during the evening of the attack.[3]

The Commonwealth's DNA evidence demonstrated that it was 330 times more likely that Hills contributed the DNA recovered from McKendry following the attack than another, randomly selected Caucasian.  Hills offered his own expert's testimony to question this determination, leaving the jury to decide the relative weight of the two experts' opinions.  The jury gave greater weight to Mary McDonald's testimony.  Because "[t]he credibility of the witnesses, the weight accorded testimony, and the inferences to be drawn from proven facts are matters to be determined by the fact finder," we cannot say the jury erred in its conclusion.  DeAmicis, 31 Va. App. at 440, 524 S.E.2d at 152.

---

[3] Hills contends that the witnesses contradicted one another.  However, as noted, we view the record in the light most favorable to the Commonwealth and discard all evidence of the accused that conflicts with that offered by the prosecution.  See DeAmicis, 31 Va. App. at 440, 524 S.E.2d at 152.  The weight to be accorded the evidence was exclusively for the jury to decide, and, as its conclusion was not plainly wrong, we will not disturb its judgment.  See Lynn, 27 Va. App. at 351, 499 S.E.2d at 8.

The jury was not bound to accept Hills' account of the evening in question, in which he denied offering McKendry a ride home and denied committing the offense. See Price, 18 Va. App. at 768, 446 S.E.2d at 647. Nor was the jury bound to accept the testimony of Hills' fiancée regarding the time Hills returned home. Because the jury's conclusion cannot be said to be plainly wrong, the trial court properly denied Hills' motion to strike the Commonwealth's evidence and his post-trial motion to set aside the verdict or to order a new trial. We will not disturb the court's decision on appeal.

### POST-TRIAL BRADY MOTION

Hills additionally contends the Commonwealth failed to disclose exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83 (1963). He argues that McKendry's admission to Detective Studer that her account of the attack was going to change because of her extreme inebriation was a statement that tended to exculpate him and should, therefore, have been disclosed to Hills no later than June 19, 1998, pursuant to the trial court's order following a hearing on Hills' motion for exculpatory evidence held on June 12, 1998. We hold that his claim is barred under Rule 5A:18.

Rule 5A:18 establishes that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the

time of the ruling . . . ." This rule exists "to inform the trial judge of the action complained of in order to give the judge the opportunity to consider the issue and to take timely corrective action . . . in order to avoid unnecessary appeals, reversals and mistrials." Robinson v. Commonwealth, 13 Va. App. 574, 576, 413 S.E.2d 885, 886 (1992) (citing Hogan v. Commonwealth, 5 Va. App. 36, 45, 360 S.E.2d 371, 376 (1987)). "To hold otherwise would invite parties to remain silent at trial, possibly resulting in the trial court committing needless error. In order to avoid this result, we adhere to the policy of placing an affirmative duty on the parties to enter timely objections to rulings made during the trial." Gardner v. Commonwealth, 3 Va. App. 418, 423, 350 S.E.2d 229, 232 (1986).

Hills neither objected nor moved for dismissal of the prosecution when defense counsel elicited from Detective Studer the fact that McKendry admitted her "story was going to change" at trial because of her intoxication on the night of the attack. Because Hills failed to timely object, as required by Rule 5A:18, his claim is waived, and we find no basis to review his contention under the "ends of justice" exception to the Rule.

### CHAIN OF CUSTODY

Hills also claims the court erred by admitting into evidence the certificate of blood analysis issued by the state forensic lab, because the Commonwealth failed to establish a

proper chain of custody. Hills contends that because the Commonwealth offered no proof of the identity of the lab representative who signed for the PERK kit and blood sample from Detective Studer,[4] the chain of custody was not established and the evidence should have been excluded from trial. We find no error in the admission of the certificate of analysis.

---

[4] Defense counsel conducted <u>voir</u> <u>dire</u> of Studer and elicited the following testimony:

> Q. Detective Studer, who did you give these materials to at the lab?
> A. The individual who signed their names on the lab sheets.
> Q. I'm asking you who?
> A. I can't read their handwriting. I don't know their name right offhand.
> Q. So you don't know who it was that you gave it to?
> A. Offhand, no.
> Q. And you don't know what their role or what their job at the lab was?
> A. The lab is to accept incoming evidence and to log it in the computer and to make sure what I'm giving them is what I said I'm giving them.
> Q. [] You don't know who those people were so you don't know of your own personal knowledge what their particular job was. Do you?
> A. Their job description, no. In particular; no, sir.
> Q. And you don't know of your knowledge what their authorization was to receive or not to receive evidence or things related to criminal cases, do you?
> A. <u>I know that they are authorized to accept what I give them and they sign for it and I sign for it</u>.

(Emphasis added).

Code § 19.2-187.01 establishes that certificates of analysis serve as evidence of the chain of custody required for the particular sample examined.  The statute reads, in part:

> A report of analysis duly attested by the person performing such analysis or examination in any [authorized] laboratory . . . shall be prima facie evidence in a criminal or civil proceeding as to the custody of the material described therein from the time such material is received by an authorized agent of such laboratory until such material is released subsequent to such analysis or examination. Any such certificate of analysis purporting to be signed by such person shall be admissible as evidence in such hearing or trial without any proof of the seal or signature or of the official character of the person whose name is signed to it.  <u>The signature of the person who received the material for the laboratory on the request for laboratory examination form shall be deemed prima facie evidence that the person receiving the material was an authorized agent and that such receipt constitutes proper receipt by the laboratory for purposes of this section</u>.

Code § 19.2-187.01 (emphasis added).

Detective Studer testified that she relinquished the DNA and blood samples to a person at the forensic lab.  That person signed for the material on the request form.  Thus, according to the plain meaning of the statute, the signature constituted <u>prima</u> <u>facie</u> evidence that the signor was an authorized agent of the lab and that his receipt of the material constituted proper receipt for purposes of the chain of custody.  Studer's inability to identify at trial the employee who received the

samples or to address, other than generally, the employee's authority to receive evidence, is not sufficient to rebut the presumption that the chain of custody was properly maintained. For these reasons, we affirm the decision of the trial court to admit the certificate of analysis under challenge in this appeal.

<u>FAILURE TO INSTRUCT THE JURY AND ALLOW</u>
<u>VOIR DIRE INQUIRY ON THE ABOLITION OF PAROLE</u>

A.  <u>Jury Instruction</u>

Finally, Hills contends the trial court erred in refusing to instruct the jury that parole has been abolished in Virginia and in precluding inquiry during <u>voir</u> <u>dire</u> on the same issue. The issue raised is controlled by the Virginia Supreme Court's recent decision in <u>Fishback v. Commonwealth</u>, 260 Va. 104, 532 S.E.2d 629 (2000).[5]  In <u>Fishback</u>, the Supreme Court declared a "new rule," holding that "juries shall be instructed, as a matter of law, on the abolition of parole for non-capital felony offenses committed on or after January 1, 1995 pursuant to Code § 53.1-165.1."  <u>Id.</u> at 115, 532 S.E.2d at ___.[6]

---

[5] Because the present case was not yet final when <u>Fishback</u> was decided, the new rule enacted in <u>Fishback</u> is controlling in this case.  <u>See</u> <u>Mueller v. Murray</u>, 252 Va. 356, 361, 478 S.E.2d 542, 546 (1996).

[6] The Court noted that despite the abolition of parole, a defendant could still be eligible for early release, pursuant to Code § 53.1-40.01 and Code § 53.1-202.2 <u>et</u> <u>seq.</u>, which provide for geriatric release and sentence reduction for good behavior credit.  <u>See</u> <u>Fishback</u>, 260 Va. at 111-12, 532 S.E.2d at ___.

We hold the trial court erred in refusing to instruct the jury concerning the abolition of parole. In this case, as in Fishback, the jury specifically inquired as to whether parole is available in Virginia. Defense counsel for Hills requested that the jury be instructed that parole is no longer available in Virginia. As in Fishback, the trial court refused this requested instruction and instead instructed the jury, "[y]ou should not concern yourself with this. You should sentence in accordance with the instructions given to you."

In light of the Fishback decision requiring that juries be instructed as to the abolition of parole, we conclude the trial court erred in refusing to so instruct the jury in this case, and we reverse and remand for resentencing.

### B.  Voir Dire

Because the issue of proper voir dire on the question of parole will likely arise again on remand, we further address this final claim. We hold the trial court erred in limiting Hills' inquiry on voir dire relative to the abolition of parole.

---

Because the possibility of geriatric release is predictable at the time of sentencing, the Court held that "where applicable juries shall also be instructed on the possibility of geriatric release . . . ." Id. at 115-16, 532 S.E.2d at ___. However, because an assessment of the likelihood of sentence reduction for good behavior credit would include mere speculation as to the defendant's future conduct, the Court concluded that "juries are not to be instructed with regard to [the good behavior sentence credit] statutory provisions." Id. at 116, 532 S.E.2d at ___.

- 24 -

Code § 8.01-358 sets forth the four areas of inquiry upon which voir dire examination may be based. The statute provides that the court and counsel may ask potential jurors "any relevant question to ascertain whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein . . . ." Code § 8.01-358.

The questions asked must be relevant and the trial court, in its discretion, determines the issue of relevancy. See LeVasseur v. Commonwealth, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983). "The test of relevancy is whether the questions relate to any of the four criteria set forth in the statute. If an answer to the question would necessarily disclose, or clearly lead to the disclosure of the statutory factors of relationship, interest, opinion, or prejudice, it must be permitted." Id.

In this case, defense counsel sought to determine what, if anything, prospective jurors knew or understood about the status of parole in Virginia, and to ferret out any existing misconceptions and/or biases which could taint the jurors' ability to render a fair and impartial verdict. The Fishback opinion makes central to the jury's sentencing task its understanding of a specific legal principle, viz., that whatever sentence they determine appropriate is no longer subject to a subsequent shortening by parole.

It follows, logically, that an examination of the issue during _voir_ _dire_ is proper, subject to the discretion of the court regarding the scope of the inquiry and other pertinent considerations.  Therefore, the trial court erred in not allowing Hills to examine prospective jurors during _voir_ _dire_ concerning their understanding of the status of parole in Virginia.

<u>Affirmed in part, reversed and remanded in part.</u>