# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-3623

ROSELVA CHAIDEZ,

*Petitioner-Appellee,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 636-6—**Joan B. Gottschall**, *Judge.*

ARGUED JUNE 10, 2011—DECIDED AUGUST 23, 2011

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* In *Padilla v. Kentucky*, 130 S. Ct. 1473, 1486 (2010), the Supreme Court held that an attorney provides ineffective assistance of counsel by failing to inform a client that a guilty plea carries a risk of deportation. The district court concluded that *Padilla* did not announce a new rule under the framework set forth in *Teague v. Lane*, 489 U.S. 288 (1989), and consequently applied its holding to Petitioner Roselva

Chaidez's collateral appeal. Because we conclude that *Padilla* announced a new rule that does not fall within either of *Teague's* exceptions, we reverse the judgment of the district court.[1]

## I.  Background

Chaidez entered the United States from her native Mexico in 1971, and became a lawful permanent resident in 1977. In June 2003, Chaidez was indicted on three counts of mail fraud in connection with a staged accident insurance scheme in which the loss to the victims exceeded $10,000. On the advice of counsel, Chaidez pled guilty to two counts on December 3, 2003. She was sentenced to four years' probation on April 1, 2004, and judgment was entered in her case on April 8, 2004. Chaidez did not appeal.

Federal law provides that an alien who is "convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii). Chaidez's plea of guilty to a fraud involving a loss in excess of $10,000 rendered her eligible for removal from the United States as an aggravated felon. *See* 8 U.S.C. § 1101(a)(43)(M)(i). The government initiated removal proceedings in 2009,

---

[1] This opinion and the dissent have been circulated among all judges of this court in regular active service pursuant to Circuit Rule 40(e). A majority of the judges did not favor rehearing en banc. Circuit Judges Rovner, Wood, Williams, and Hamilton voted to rehear the case en banc.

after Chaidez unsuccessfully filed an application for U.S. citizenship.

In an effort to avoid removal, Chaidez sought to have her conviction overturned. To that end, she filed a motion for a writ of coram nobis in her criminal case on January 25, 2010. She alleges ineffective assistance of counsel in connection with her decision to plead guilty, claiming that her defense attorney failed to inform her that a guilty plea could lead to removal. Chaidez maintains that she would not have pled guilty if she had been made aware of the immigration consequences of such a plea.

On March 31, 2010, while Chaidez's motion was pending before the district court, the Supreme Court issued its decision in *Padilla.* In a thoughtful opinion, Judge Gottschall acknowledged that this case presents a close call. She concluded that *Padilla* did not announce a new rule for *Teague* purposes, but rather was an application of the Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984). Having concluded that *Padilla* applied to Chaidez's case, the district court considered the merits of her coram nobis petition. The court granted the petition and vacated Chaidez's conviction. The government appeals the district court's underlying ruling regarding the retroactive effect of *Padilla*.

## II. Discussion

The writ of coram nobis, available under the All Writs Act, 28 U.S.C. § 1651(a), provides a method for col-

laterally attacking a criminal conviction when a defendant is not in custody, and thus cannot proceed under 28 U.S.C. § 2255. *United States v. Folak*, 865 F.2d 110, 112-13 (7th Cir. 1988). The writ is an extraordinary remedy, allowed only where collateral relief is necessary to address an ongoing civil disability resulting from a conviction. *Godoski v. United States,* 304 F.3d 761, 762 (7th Cir. 2002). Because a writ of error coram nobis affords the same general relief as a writ of habeas corpus, *Howard v. United States*, 962 F.2d 651, 653 (7th Cir. 1992), we proceed as we would in a habeas case. *See United States v. Mandanici*, 205 F.3d 519, 527 (2d Cir. 2000) (applying *Teague* in a case involving a coram nobis petition); *United States v. Swindall*, 107 F.3d 831, 834 (11th Cir. 1997) (same). Our review is de novo.

In *Padilla*, the Court considered the petitioner's claim that his counsel provided ineffective assistance by erroneously advising him that pleading guilty to a drug distribution charge would not impact his immigration status. The Kentucky Supreme Court had rejected Padilla's claim, concluding that advice regarding the collateral consequences of a guilty plea ("i.e., those matters not within the sentencing authority of the state trial court"), including deportation, is "outside the scope of representation required by the Sixth Amendment." 130 S. Ct. at 1481. As the *Padilla* Court noted, many state and federal courts had similarly concluded that a defendant's Sixth Amendment right to effective assistance of counsel was limited to advice about the direct consequences of a guilty plea (i.e., length of imprisonment), and did not extend to information regarding

collateral consequences (i.e., deportation). *Id.* However, in a majority opinion authored by Justice Stevens, the *Padilla* Court concluded that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel." 130 S. Ct. at 1482. Noting that it had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland*," the Court declined to consider the appropriateness of the direct/collateral distinction generally. *Id.* at 1481. Rather, it found such a distinction "ill-suited to evaluating a *Strickland* claim concerning the specific risk of deportation." *Id.* at 1481-82.

The majority based that conclusion on "the unique nature of deportation"—specifically, its severity as a penalty and its close relationship to the criminal process. *Id.* at 1481. The Court noted that recent changes in federal immigration law, including the Immigration Act of 1990 and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), had served to further "enmesh[ ] criminal convictions and the penalty of deportation," by making "removal nearly an automatic result for a broad class of noncitizen offenders." *Id.* at 1478-81. Those changes convinced the Court that "deportation is an integral part . . . of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes," and cannot be "divorce[d] . . . from the conviction." *Id.* at 1480-81. As a result, the Court concluded that *Strickland* applied to Padilla's ineffective assistance claim. 130 S. Ct. at 1482.

The Court went on to consider the first *Strickland* prong—whether Padilla had established that his counsel's representation fell below an objective standard of reasonableness. In order to determine what constituted reasonable representation under the circumstances, the Court looked to prevailing professional norms set forth by the American Bar Association and numerous other authorities. *Id.* at 1482, 1485. The Court found that, dating back to the mid-1990s, those authorities had been in agreement that counsel must advise his or her client regarding the risk of deportation. *Id.* Thus, the Court held that defense counsel provides constitutionally deficient representation by failing to inform a defendant that a guilty plea carries a risk of deportation. *Id.* at 1486.

Chaidez seeks to have *Padilla* applied to her case on collateral review, despite the fact that the criminal case against her was final on direct review when *Padilla* was decided. *Teague* governs our analysis. *Whorton v. Bockting*, 549 U.S. 406, 416 (2007). Under *Teague,* a constitutional rule of criminal procedure applies to all cases on direct and collateral review if it is not a new rule, but rather an old rule applied to new facts. *Id.* A new rule applies only to cases that still are on direct review, unless one of two exceptions applies. *Id.* In particular, a new rule applies retroactively on collateral review if (1) it is substantive or (2) it is a "'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* (citations omitted).

The parties agree that if *Padilla* announced a new rule neither exception to non-retroactivity applies. Therefore, whether *Padilla* announced a new constitutional rule of criminal procedure is the sole issue before us. The district courts that have addressed that issue—including those in this circuit—are split. *See United States v. Diaz-Palmerin*, 2011 WL 1337326 (N.D. Ill. April 5, 2011) (*Padilla* did not announce a new rule); *Martin v. United States*, 2010 WL 3463949 (C.D. Ill. Aug. 25, 2010) (same); *United States v. Chavarria*, 2011 WL 1336565 (N.D. Ind. April 7, 2011) (same); *United States v. Laguna*, 2011 WL 1357538 (N.D. Ill. April 11, 2011) (*Padilla* announced a new rule); *United States v. Aceves*, 2011 WL 976706, at *3 (D. Hawai'i March 17, 2011) (collecting cases). The Third Circuit recently became the first of our sister circuits to weigh in, holding that *Padilla* simply applied the old *Strickland* rule, such that it is retroactively applicable on collateral review. *United States v. Orocio*, 645 F.3d 630, 2011 WL 2557232, at *7 (3d Cir. June 29, 2011).

A rule is said to be new when it was not "*dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301 (emphasis in original). That definition of what constitutes a new rule reflects the fact that *Teague* was developed in the context of federal habeas, which is designed "to ensure that state convictions comply with the federal law in existence at the time the conviction became final, and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine." *Sawyer v. Smith*, 497 U.S.

227, 235 (1990). *See also Danforth v. Minnesota,* 552 U.S. 264, 280 (2008) (describing *Teague* as a "limit[ation on] the authority of federal courts to overturn state convictions"). Thus, the Court has explained that *Teague* "validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Saffle v. Parks,* 494 U.S. 484, 488 (1990) (quoting *Butler v. McKellar,* 494 U.S. 407, 414 (1990)). The pertinent inquiry here is whether *Padilla*'s outcome was "susceptible to debate among reasonable minds." *Butler,* 494 U.S. at 415. Put differently, "our task is to determine whether a . . . court considering [Chaidez's] claim at the time [her] conviction became final"—pre-*Padilla*—"would have felt compelled by existing precedent to conclude that [*Padilla*] was required by the Constitution." *Saffle,* 494 U.S. at 488.

That task is a "difficult" one where, as here, the decision at issue "extends the reasoning of . . . prior cases," as opposed to "explicit[ly] overruling . . . an earlier holding." *Id.* However, the Court's retroactivity jurisprudence provides guidance. In assessing whether the outcome of a case was susceptible to reasonable debate, the Court has looked to both the views expressed in the opinion itself and lower court decisions. Lack of unanimity on the Court in deciding a particular case supports the conclusion that the case announced a new rule. *See Beard v. Banks,* 542 U.S. 406, 414-15 (2004) (concluding that a rule was new where, in the case announcing the rule, four Justices dissented, expressing the view that the Court's outcome was not controlled by precedent); *Sawyer v. Smith,* 497 U.S. 227, 236-37 (1990)

(concluding that *Caldwell v. Mississippi,* 472 U.S. 320 (1985), announced a new rule, in part based on the views of the *Caldwell* dissenters). Similarly, if the lower courts were split on the issue, the Court has concluded that the outcome of the case was susceptible to reasonable debate. *See Butler,* 494 U.S. at 415 ("That the outcome in [*Arizona v.*] *Roberson*[*,* 486 U.S. 675 (1988)] was susceptible to debate among reasonable minds is evidenced further by the differing positions taken by the judges of the Courts of Appeals for the Fourth and Seventh Circuits"); *O'Dell v. Netherland*, 521 U.S. 151, 166 n.3 (1997) (finding support for its conclusion that a case announced a new rule "in the decisions of the state courts and the lower federal courts," none of which previously had adopted the rule). These considerations convince us that *Padilla* announced a new rule.

The majority opinion in *Padilla* drew a concurrence authored by Justice Alito and joined by Chief Justice Roberts, as well as a dissenting opinion authored by Justice Scalia and joined by Justice Thomas. That the members of the *Padilla* Court expressed such an "array of views" indicates that *Padilla* was not dictated by precedent. *O'Dell*, 521 U.S. at 159. Moreover, the views expressed in each of the opinions support that conclusion. Statements in the concurrence leave no doubt that Justice Alito and Chief Justice Roberts considered *Padilla* to be ground-breaking. *See* 130 S. Ct. at 1488, 1491, 1492 (referring to the majority's holding as a "dramatic departure from precedent," "a major upheaval in Sixth Amendment law," and a "dramatic expansion of the scope of criminal defense counsel's duties under the Sixth Amendment"). And the two dissenting Justices,

who expressed the view that the majority's extension of the Court's Sixth Amendment jurisprudence lacked "basis in text or in principle," certainly did not see *Padilla* as dictated by precedent. 130 S. Ct. at 1495 (Scalia, J., dissenting). *See also Sawyer*, 497 U.S. at 236-37. Even the majority suggested that the rule it announced was not *dictated* by precedent, stating that while Padilla's claim "follow[ed] from" its decision applying *Strickland* to advice regarding guilty pleas in *Hill v. Lockhart,* 474 U.S. 52 (1985), *Hill* "does not control the question before us." *Id.* at 1485 n.12. It seems evident from Supreme Court precedent that *Padilla* cannot be an old rule simply because existing case law "inform[ed], or even con-trol[led] or govern[ed]," the analysis. *Saffle*, 494 U.S. at 488. Nor will the rule of *Padilla* be deemed old because precedent lent "general support" to the rule it estab-lished, *Sawyer*, 497 U.S. at 236, or because it represents "the most reasonable . . . interpretation of general law," *Lambrix v. Singletary*, 520 U.S. 518, 538 (1997). *Padilla* can only be considered an old rule if Supreme Court precedent *"compel[led]"* the result. *Saffle*, 494 U.S. at 490. The majority's characterization of *Hill* suggests that it did not understand the rule set forth in *Padilla* to be dictated by precedent.

Our conclusion that *Padilla* announced a new rule finds additional support in pre-*Padilla* decisions by state and federal courts. Prior to *Padilla*, the lower federal courts, including at least nine Courts of Appeals, had uniformly held that the Sixth Amendment did not require counsel to provide advice concerning any col-lateral (as opposed to direct) consequences of a guilty

plea. *See Padilla*, 130 S. Ct. at 1487 (Alito, J., concurring in judgment) ("Until today, the longstanding and unanimous position of the federal courts was that reasonable defense counsel generally need only advise a client about the *direct* consequences of a criminal conviction," not collateral consequences such as deportation); Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 CORNELL L. REV. 697, 699, 703 (2002) (stating that "virtually all jurisdictions" to have considered the issue had held that "defense lawyers must explain the direct consequences of a plea, such as length of imprisonment and amount of fine, but need not explain 'collateral consequences,' such as . . . deportation"); *Commonwealth v. Clarke*, 460 Mass. 30, 35-36, (Mass. 2011) ("*Padilla* effectively changed the law in the nine circuit courts of the United States Court of Appeals that had previously addressed the issue" of whether "defense counsel was ineffective by failing to advise her client of the virtually automatic deportation consequences of his guilty plea"). Courts in at least thirty states and the District of Columbia had reached the same conclusion. 87 CORNELL L. REV. at 699. Such rare unanimity among the lower courts is compelling evidence that reasonable jurists reading the Supreme Court's precedents in April 2004 could have disagreed about the outcome of *Padilla*. *See Lambrix*, 520 U.S. at 538 (finding it "plain . . . that a jurist considering all the relevant material . . . could reasonably have reached a conclusion contrary to our holding in" *Espinosa v. Florida*, 505 U.S. 1079 (1992) (*per curiam*), where "both before and after [petitioner's] conviction became final, every court decision we are aware of did so").

In concluding that *Padilla* did not announce a new rule, the Third Circuit downplayed the significance of the contrary lower court decisions, reasoning that they generally pre-dated the adoption of the professional norms relied on by the *Padilla* Court. *Orocio*, 2011 WL 2557232, at *6. Not so. While Justice Alito cited primarily pre-1995 cases in his concurrence, in the years preceding *Padilla*, the lower federal courts consistently reaffirmed that deportation is a collateral consequence of a criminal conviction and that the Sixth Amendment does not require advice regarding collateral consequences. *See United States v. Fry*, 322 F.3d 1198, 1200 (9th Cir. 2003); *Jimenez v. United States*, 154 Fed. Appx. 540, 541 (7th Cir. Nov. 18, 2005) (unpublished). In doing so, three Courts of Appeals explicitly rejected the argument that the enactment of the IIRIRA altered the calculus. *See United States v. Gonzalez*, 202 F.3d 20, 28 (1st Cir. 2000) (holding that deportation remained a collateral consequence of conviction after the passage of the IIRIRA, and reaffirming its prior conclusion that an attorney's failure to advise a client of his plea's immigration consequences does not give rise to a cognizable ineffective assistance claim); *Santos-Sanchez v. United States,* 548 F.3d 327, 336-37 (5th Cir. 2008) (concluding that "neither IIRIRA nor AEDPA has so altered the nature of deportation as to render it a direct consequence of a guilty plea," and reaffirming that "counsel's failure to inform a defendant of the collateral consequences of a guilty plea is never deficient performance under *Strickland*"); *Broomes v. Ashcroft*, 358 F.3d 1251, 1257 (10th Cir. 2004) (concluding that even under the IIRIRA and AEDPA, "deportation remains a collateral consequence of a

criminal conviction, and counsel's failure to advise a criminal defendant of its possibility does not result in a Sixth Amendment deprivation").

We acknowledge that "the mere existence of conflicting authority does not necessarily mean a rule is new." *Williams v. Taylor*, 529 U.S. 362, 410 (2000), quoting *Wright v. West*, 505 U.S. 277, 304 (1992) (O'Connor, J., concurring). But, in our view, "an objective reading of the relevant cases" demonstrates that *Padilla* was not dictated by precedent. *Stringer v. Black*, 503 U.S. 222, 237 (1992). It is true that, unlike so many lower courts, the Supreme Court has "never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland*." *Padilla*, 130 S. Ct. at 1481. As such, prior to *Padilla*, the Court had not foreclosed the possibility that advice regarding collateral consequences of a guilty plea could be constitutionally required. But neither had the Court required defense counsel to provide advice regarding consequences collateral to the criminal prosecution at issue.[2] 130 S. Ct. at 1495 (Scalia, J., dissenting).

---

[2] In *Hill*, the Court considered whether a criminal defendant's Sixth Amendment right to counsel was violated when his counsel misinformed him about his eligibility for parole, a collateral consequence of conviction. However, the Court found it "unnecessary to determine whether there may be circumstances under which erroneous advice by counsel as to parole eligibility may be deemed constitutionally ineffective assistance of counsel." 474 U.S. at 60.

Moreover, the distinction between direct and collateral consequences was not without foundation in Supreme Court precedent. It can be traced to the Court's jurisprudence regarding the validity of guilty pleas. To be valid, a guilty plea must be both voluntary and intelligent. *Brady v. United States*, 397 U.S. 742, 747 (1970). The Court has long held that a plea is voluntary where the defendant is "fully aware of the direct consequences" of the plea. *Id.* The Court also has said that where "a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56 (citation omitted). At least some lower courts extrapolated from these holdings that counsel performs effectively by advising a client as to the direct consequences of conviction. *See* 87 CORNELL L. REV. at 726 (attributing the collateral consequences rule to "the *Brady* Court's implication that a trial court need advise a defendant only of direct consequences to render a plea voluntary under the Due Process Clause"); *Santos v. Kolb*, 880 F.2d 941, 944 (7th Cir. 1989) (concluding, based on *Hill*, that "the key to whether defense counsel has failed to provide effective assistance is whether his shortcomings resulted in an involuntary or unintelligent plea"); *United States v. Banda*, 1 F.3d 354, 356 (5th Cir. 1993) (concluding that counsel's failure to warn of possible deportation did not amount to ineffective assistance of counsel, reasoning that that "conclusion squares with the Supreme Court's observation that the accused must be 'fully

aware of the *direct* consequences' of a guilty plea")
(quoting *Brady*, 397 U.S. at 755).

Therefore, we "cannot say that the large majority of
federal and state courts that ha[d] rejected" ineffective-
assistance-of-counsel claims based on advice about the
deportation consequences of a plea were "unreasonable"
in their reading of existing Supreme Court precedent.
*Saffle*, 494 U.S. at 490. We consequently remain persuaded
by the weight of lower court authority that, in 2004, a
jurist could reasonably have reached a conclusion
contrary to the holding in *Padilla*, such that *Padilla* an-
nounced a new rule for purposes of *Teague*.

As the Massachusetts Supreme Judicial Court recently
noted, "[t]here is no question that the holding in *Padilla*
is an extension of the rule in *Strickland*," "[n]or is there
any question that the Supreme Court was applying the
first prong of the *Strickland* standard when it concluded
that the failure of counsel to provide her client with
available advice about an issue like deportation was
constitutionally deficient." *Clarke*, 460 Mass. at 37. How-
ever, we disagree with that court's conclusion that,
because "the opinion in *Padilla* relies primarily on cita-
tion to *Strickland* itself," *Padilla* was dictated by *Strick-
land*. *Id.* at 44. Under *Teague*, a rule is old only if it sets forth
the *sole* reasonable interpretation of existing precedent.
*Lambrix*, 520 U.S. at 538. The fact that *Padilla* is an exten-
sion of *Strickland* says nothing about whether it was new
or not. *See Saffle*, 494 U.S. at 488 ("it is more difficult,
however, to determine whether we announce a new
rule when a decision extends the reasoning of our prior

cases"); *Butler*, 494 U.S. at 415 ("the fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*"); *Frazer v. South Carolina*, 430 F.3d 696, 720 (4th Cir. 2005) (Luttig, J., dissenting) ("to establish that the Supreme Court relied exclusively on the principles of prior cases in reaching the rule of [*Roe v.*] *Flores-Ortega*[, 528 U.S. 470 (2000)] is not at all to establish that those cases dictated that rule, that is, that all reasonable jurists would have agreed that those precedents led inexorably to *Flores-Ortega*").

We recognize that the application of *Strickland* to unique facts generally will not produce a new rule. *See Williams*, 529 U.S. at 382 (plurality) ("If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule") (quoting *Wright v. West*, 505 U.S. 277, 309 (1992) (Kennedy, J., concurring)). However, that guiding principle is not absolute. *Id.* (stating that "[w]here the beginning point is a rule of . . . general application, . . . it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent").[3] We believe

---

[3] The *Williams* Court further stated that: "It is true that while the *Strickland* test provides sufficient guidance for resolving

(continued...)

*Padilla* to be the rare exception. Before *Padilla*, the Court had never held that the Sixth Amendment requires a criminal defense attorney to provide advice about matters not directly related to their client's criminal prosecution. In *Padilla*, the Court held that constitutionally effective assistance of counsel requires advice about a civil penalty imposed by the Executive Branch (now the Department of Homeland Security, formerly the Immigration and Naturalization Service)

---

[3] (...continued)
virtually all ineffective-assistance-of-counsel claims, there are situations in which the overriding focus on fundamental fairness may affect the analysis." 529 U.S. at 391. Some courts, and the dissent, appear to have read the first phrase in that sentence to mean that, in effect, no case applying the *Strickland* test announces a new rule. *See Clarke*, 460 Mass. at 39; *Lewis v. Johnson*, 359 F.3d 646, 655 (3d Cir. 2004). We believe the context in which the Court made that assertion undermines that interpretation. In *Williams*, the Court held that the "Virginia Supreme Court erred in holding that . . . *Lockhart v. Fretwell*, 506 U.S. 364 (1993), modified or in some way supplanted the rule set down in *Strickland*." 529 U.S. at 391. The Court simply was explaining that *Strickland* remains the test for analyzing ineffective-assistance-of-counsel claims, "virtually all" of which can be resolved without inquiring into "fundamental fairness," as the Court had in *Lockhart*. *Id.* at 391-93. *See also Frazer*, 430 F.3d at 723 (Luttig, J., dissenting) for a similar analysis. Moreover, the fact that "the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims," does not mean it *dictates* the resolution of all such claims. *Id.*

after the criminal case is closed. In our view, that result was sufficiently novel to qualify as a new rule. Indeed, if *Padilla* is considered an old rule, it is hard to imagine an application of *Strickland* that would qualify as a new rule. Perhaps in the future the Court will conclude, given the breadth and fact-intensive nature of the *Strickland* reasonableness standard, that cases extending *Strickland* are never new. But until that time, we are bound to apply *Teague* in the context of *Strickland*.

The specific contours of the *Padilla* holding further indicate that it is a new rule. Under the rule set forth in *Padilla*, the scope of an attorney's duty to provide immigration-related advice varies depending on the degree of specialization required to provide such advice accurately. In particular, the Court held that "when the deportation consequence [of a guilty plea] is truly clear," counsel has a duty to "give correct advice." 130 S. Ct. at 1483. But "[w]hen the law is not succinct and straightforward," such that "the deportation consequences of a particular plea are unclear or uncertain," "a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Id.* That nuanced, new analysis cannot, in our view, be characterized as having been dictated by precedent.

The district court relied on the fact that *Padilla* itself was before the Court on a motion for post-conviction relief for its conclusion that the Court intended for *Padilla* to apply retroactively to cases on collateral appeal. In light of the fact that Kentucky did not raise *Teague*

as a defense in *Padilla*, we do not assign the significance to *Padilla*'s procedural posture that the district court did. While "[r]etroactivity is properly treated as a threshold question," *Teague* "is not 'jurisdictional' in the sense that [the] Court . . . *must* raise and decide the issue *sua sponte*." *Collins v. Youngblood*, 497 U.S. 37, 40-41 (1990) (emphasis in original). Therefore, if a State does not rely on *Teague*, the Court has no obligation to address it, and can consider the merits of the claim. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). We believe it is more likely that the Court considered *Teague* to be waived, than that it silently engaged in a retroactivity analysis.

Finally, the district court reasoned that the best way to make sense of the *Padilla* Court's discussion (and dismissal) of concerns that its ruling would undermine the finality of plea-based convictions was to conclude that the majority intended *Padilla* to apply retroactively. 130 S. Ct. at 1484-85. The Third Circuit reached a similar conclusion. *See also Orocio*, 2011 WL 2557232, at *7. That is a reasonable reading, and certainly is the most compelling argument that *Padilla* is an old rule. However, we are hesitant to depart from our application of the test set forth in *Teague* and its progeny—which points clearly in the direction of new rule—based on inferences from indirect language. Moreover, to the extent that we attempt to discern whether members of the Court understood *Padilla* to be a new rule, we find the clearest indications in the concurrence and dissent, which leave no doubt that at least four Justices view *Padilla* as new.

### III.  Conclusion

The Supreme Court has defined the concept of an old rule under *Teague* narrowly, limiting it to those holdings so compelled by precedent that any contrary conclusion must be deemed unreasonable. While determining whether a rule is new can be challenging, and this case provides no exception, we conclude that the narrow definition of what constitutes an old rule tips the scales in favor of finding that *Padilla* announced a new rule. Moreover, that numerous courts had failed to anticipate the holding in *Padilla*, though not dispositive, is strong evidence that reasonable jurists could have debated the outcome. For the foregoing reasons, we REVERSE the judgment of the district court and REMAND the case for further proceedings.

WILLIAMS, *Circuit Judge*, dissenting.  At the time Roselva Chaidez, a lawful permanent resident since 1977, entered her plea, prevailing professional norms placed a duty on counsel to advise clients of the removal consequences of a decision to enter a plea of guilty. I would join the Third Circuit in finding that *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010), simply clarified that a violation of these

norms amounts to deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984). *See United States v. Orocio*, ___ F.3d __, 2011 WL 2557232 (3d Cir. June 29, 2011). As such, Padilla did not announce a "new rule" under *Teague v. Lane*, 489 U.S. 288 (1989), and is therefore retroactively applicable to Chaidez's coram nobis petition seeking to vacate her guilty plea on the grounds that her counsel was ineffective. For the reasons set forth below, I dissent.

I do not disagree that *Teague* holds that a "case announces a new rule when it breaks new ground or imposes a new obligation on the States or Federal Government," and "if the result was not *dictated* by precedent existing at the time the [petitioner's] conviction became final." *Teague*, 489 U.S. at 301 (emphasis in original). I do, however, disagree with the majority as to how *Teague*'s holding applies in the context of *Strickland v. Washington*.

In *Padilla*, the Court found that because "deportation is a particularly severe 'penalty,' . . . advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel." 130 S. Ct. at 1478. The Court then stated that the first inquiry under Strickland, whether counsel's representation "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, is "necessarily linked to the practice and expectations of the legal community." *Padilla*, 130 S. Ct. at 1482. Noting that *Strickland*'s standard looked to "reasonableness under prevailing professional norms," the *Padilla* Court held that "[t]he weight of prevailing

professional norms supports the view that counsel must advise her client regarding the risk of deportation." *Id.* (citing *Strickland*, 466 U.S. at 688, and listing numerous guidelines and standards requiring advice on the deportation resulting from guilty pleas).

By citing and relying on *Strickland*, and applying that case to Padilla's claim, the Court "broke no new ground in holding the duty to consult also extended to counsel's obligation to advise the defendant of the immigration consequences of a guilty plea." *United States v. Orocio*, 2011 WL 2557232, at *6 (internal quotations omitted). The decision "is best read as merely recognizing that a plea agreement's immigration consequences constitute the sort of information an alien defendant needs in making 'important decisions' affecting 'the outcome of the plea process,' and thereby come within the abmit of the 'more particular duties to consult with the defendant' required of effective counsel." *Id.* at *4 (citing *Strickland*, 466 U.S. at 688). Under such a reading, *Padilla* was a mere application of *Strickland* to the facts before the Court, and therefore not a "new rule."

Following *Teague*, the early Supreme Court retroactivity cases cast the "new rule" inquiry as whether or not "reasonable jurists" would agree that a rule was not "dictated" by precedent. *See, e.g., Butler v. McKellar*, 494 U.S. 407, 414 (1990) ("The 'new rule' principle therefore validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions.");

*see also Sawyer v. Smith*, 497 U.S. 227, 234 (1990). But this narrow conception of the "dictated" language from *Teague* is not the relevant inquiry in the *Strickland* context. "The often repeated language that *Teague* endorses 'reasonable, good-faith interpretations' by state courts is an explanation of policy, not a statement of law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000) (plurality) (quoting *Butler*, 494 U.S. at 414). As the Court has stated, and as the majority today recognizes, "the *Strickland* test provides sufficient guidance for resolving *virtually all* ineffective-assistance-of-counsel claims," *id.* at 391 (opinion of the Court) (emphasis added). "[W]here the starting point is a rule of general application such as *Strickland*, "it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent," *Wright v. West*, 505 U.S. 277, 308-09 (1992) (Kennedy, J., concurring). Given this clear language regarding *Teague*'s applicability in the *Strickland* context, I cannot find that the Supreme Court's retroactivity cases where *Strickland* is not implicated compel a finding that the rule announced in *Padilla* is "new."

In *Williams*, the Court was addressing *Strickland* under the "clearly established law" requirement of 28 U.S.C. § 2254(d)(1), which a plurality found codified *Teague*'s requirement that federal habeas courts must deny relief that is contingent upon a rule of law not "clearly established" at the time the state conviction became final. 529 U.S. at 379-80. Parts I, III, and IV of the opinion were on behalf of a majority. The opinion of the Court stated:

It is past question that the rule set forth in *Strickland* qualifies as "clearly established Federal law, as determined by the Supreme Court of the United States." That the *Strickland* test "of necessity requires a case-by-case examination of the evidence," *Wright*, 505 U.S., at 308, 112 S. Ct. 2482 (Kennedy, J., concurring in judgment), obviates neither the clarity of the rule nor the extent to which the rule must be seen as "established" by this Court. This Court's precedent "dictated" that the Virginia Supreme Court apply the *Strickland* test at the time that court entertained Williams' ineffective-assistance claim. . . . And it can hardly be said that recognizing the right to effective counsel "breaks new ground or imposes a new obligation on the States."

529 U.S. at 391 (internal citations omitted). Where such a "case-by-case examination" is required, "we can tolerate a number of specific applications without saying that those applications themselves create a new rule." *Wright*, 505 U.S. at 308-09 (Kennedy, J., concurring).

This case is one of those "specific applications" that does not create a new rule. In applying *Strickland* to this particular set of facts, the Court found that prevailing professional norms in place at the time of the defendant's plea required counsel to act in accordance with those norms, and that the advice required was clear and apparent. *Padilla*, 130 S. Ct. at 1482 ("The weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation. . . .

Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute . . . ."); *see also Osagiede v. United States*, 543 F.3d 399, 409 (7th Cir. 2008) (finding *Strickland* violation for failure to comply with Article 36 of the Vienna Convention where "[t]he law was on the books; the violation was clear. Simple computer research would have turned it up"). That the *Padilla* Court began by addressing whether *Strickland* applied to Padilla's claim is of no consequence. As the Third Circuit recognized, the true question addressed by *Padilla* is whether counsel has been constitutionally adequate in advising a criminal defendant as to whether or not to accept a plea bargain. *Orocio*, 2011 WL 2557232, at *4. The analytical mechanism by which the Court applied *Strickland* does not detract from the fact that *Strickland* is the general test governing ineffective assistance claims, and that the *Padilla* Court did no more than recognize that removal is the type of consequence that a defendant needs to be informed of when making the decision of whether to plea.

Given how *Teague* and *Strickland* co-exist, I would not find that the concurring and dissenting views in *Padilla* compel a finding that the majority's opinion is a "new rule." Despite using dissenting views to inform the analysis of whether reasonable jurists could differ on whether precedent dictates a particular result, the Court has "not suggest[ed] that the mere existence of a dissent suffices to show that the rule is new." *Beard v. Banks*, 542 U.S. 406, 416 n.5 (2004). And where the Court has relied on an "array of views" to find a rule "new," the

underlying case that the petitioner sought to have applied in fact had no majority opinion. *See, e.g., O'Dell v. Netherland*, 521 U.S. 151, 159 (1997) (discussing *Simmons v. South Carolina*, 512 U.S. 154 (1994) (plurality opinion), and finding that "*Simmons* is an unlikely candidate for 'old-rule' status. As noted above, there was no opinion for the Court."). The existence of concurring and dissenting views does not alter the fact that the prevailing professional norms at the time of Chaidez's plea required a lawyer to advise her client of the immigration consequences of a guilty plea. Even in light of dissenting views, "*Strickland* did not freeze into place the objective standards of attorney performance prevailing in 1984, never to change again." *Orocio*, 2011 WL 2557232, at *6. The concurring and dissenting opinions do not alter the straightforward application of *Strickland* that the majority engaged in. In *Padilla*, even the concurring Justices agreed that counsel must, at the very least, advise a noncitizen "defendant that a criminal conviction may have adverse immigration consequences." *Padilla*, 130 S. Ct. at 1487 (Alito, J., concurring). And Justices have disagreed on whether an outcome was "dictated" by precedent where a majority found that a novel application of an old precedent was not a "new rule." *See, e.g., Stringer v. Black*, 503 U.S. 222, 237 (1992) (holding that cases invalidating use of vague aggravating factors in capital sentencing applied to Mississippi's capital sentencing law despite the fact that Mississippi used a different method of weighing aggravating and mitigating factors, and was therefore not a "new rule," with three Justices dissenting).

The strongest argument that the government and major-ity opinion make is the unanimity among the lower courts prior to *Padilla* that the Sixth Amendment does not require counsel to warn clients of the immigration consequences of a guilty plea. The early cases, however, relied on the categorization of removal or deportation as a "collateral" consequence. *See United States v. Santelises*, 476 F.2d 787 (2d Cir. 1973); *United States v. Campbell*, 778 F.2d 764 (11th Cir. 1985); *United States v. Quinn*, 836 F.2d 654 (1st Cir. 1988); *United States v. Yearwood*, 863 F.2d 6 (4th Cir. 1988); *United States v. George*, 869 F.2d 333 (7th Cir. 1989); *United States v. Del Rosario*, 902 F.2d 55 (D.C.Cir. 1990); *United States v. Banda*, 1 F.3d 354 (5th Cir. 1993). This is a classification that the *Padilla* court specifically rejected. *Padilla*, 130 S. Ct. at 1482 (finding that "because of its close connection to the criminal pro-cess," removal is "uniquely difficult to classify as either a direct or collateral consequence"). The Court found that deportation is "intimately related to the criminal process," and that "[o]ur law has enmeshed criminal convictions and the penalty of deportation for nearly a century." *Id*. at 1481. The Court also found that "recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders." *Id*. The Court therefore found it "'most difficult' to divorce the penalty from the convic-tion in the deportation context." *Id.* (citations omitted).

Despite the drastically changed immigration landscape following the passage of IIRIRA in 1996, more recent lower court decisions did not revisit earlier holdings regarding deportation's collateral nature, and declined

to find deportation any less collateral. *See United States v. Gonzalez*, 202 F.3d 20 (1st Cir. 2000) (reaffirming *Quinn*, 836 F.2d 654 and stating that "Gonzalez has failed to persuade us that our precedents regarding the collateral nature of deportation require visitation"); *United States v. Fry*, 322 F.3d 1198 (9th Cir. 2003); *Broomes v. Ashcroft*, 358 F.3d 1251 (10th Cir. 2004); *Santos-Sanchez v. United States*, 548 F.3d 327 (5th Cir. 2008). These cases, however, cannot change the fact that the Supreme Court itself "never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland* . . . ," *Padilla*, 130 S. Ct. at 1481 (citations omitted), a more relevant inquiry for *Teague* purposes. Not only did the Supreme Court never make this distinction, but in 2001 the Court stated that "preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." *INS v. St. Cyr*, 533 U.S. 289, 323 (2001). The flaw in the collateral versus direct consequences distinction was known at the time of Chaidez's plea. *See* Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 699, 703 (2002) ("The collateral consequences rule is remarkable because it has apparently been embraced by every jurisdiction that has considered it, yet it is inconsistent with the ABA standards and the practices of good lawyers as described by the Supreme Court and other authoritative sources."). And as the majority recognizes, "the mere existence of conflicting authority does not necessarily mean a rule is new." *Williams*, 529 U.S.

at 410 (quoting *Wright*, 505 U.S. at 304 (1992) (O'Connor, J., concurring). The only question for *Teague* purposes in the *Strickland* context is whether counsel was constitutionally adequate in advising a criminal defendant as to whether or not to accept a plea bargain. *Orocio*, 2011 WL 2557232, at *4. Relying on lower court decisions to the contrary would overlook *Strickland*'s straightforward language that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms"—professional norms that the *Padilla* Court found had been in place for at least fifteen years prior to its holding. *Padilla*, 130 S. Ct. at 1482-83 (listing guidelines and standards that constitute the "weight of prevailing professional norms"). I would therefore not find the unanimity among the lower courts pre-dating *Padilla* "compelling" for purposes of our current *Teague* analysis.

My colleagues downplay the plain language in *Padilla* that itself signals anticipated retroactive application. The majority in *Padilla* specifically stated that its decision will not "open the floodgates" to challenges of convictions and further stated that "[i]t seems unlikely that our decision today will have a significant effect on those convictions *already* obtained as the result of plea bargains." *Padilla*, 130 S. Ct. at 1485 (emphasis added). This floodgates argument is a clear reference to petitions such as the one at hand that challenge the past deficient performance of counsel. The Court's use of the past tense in *Padilla* forecloses an argument that it was only referring to prospective challenges, especially when the two subsequent sentences of the

opinion speak of professional norms over the "*past* 15 years" and that courts should presume that counsel satisfied their obligation "at the time their clients *considered* pleading guilty." *Id.* (emphasis added) ("For at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea. . . . We should, therefore, presume that counsel satisfied their obligation to render competent advice at the time their clients considered pleading guilty.") (internal citations omitted); *see also Orocio*, 2011 WL 2557232, at *7 ("Indeed, close scrutiny of the *Padilla* opinion leads us to consider it not unlikely that the *Padilla* Court anticipated the retroactive application of its holding on collateral review when it considered the effect of its decision would have on final convictions . . . ."). Such a discussion would be unnecessary if the Court intended that *Padilla* only apply prospectively. The government argues that the floodgates discussion referred only to state post-conviction proceedings, as states are free to offer post-conviction relief without regard to *Teague. See Danforth v. Minnesota*, 552 U.S. 264, 280-81 (2008). However, in its floodgates discussion, the *Padilla* Court relied on research that included both state *and federal* post conviction proceedings when citing how many habeas petitions filed arise from guilty pleas. *Padilla*, 130 S. Ct. at 1485 (citing V. Flango, National Center for State Courts, Habeas Corpus in State and Federal Courts 36-38 (1994)).

As the Court in *Padilla* signaled, if mere applications of *Strickland* are "old rules," it does not necessarily follow that every petitioner will be able to take advantage

of those mere applications. First, the *Padilla* Court relied on the professional norms in place at the time of plea, and the fact that Padilla's counsel "could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute . . . ." *Padilla*, 130 S. Ct. at 1482. Not every noncitizen who pled to an offense will be in that position. *Id.* at 1483 ("There will . . . undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain.") Additionally, *Strickland* also requires a showing of prejudice. *Strickland*, 466 U.S. at 694 (asking whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). Showing prejudice, much like deficient performance, is adjudicated depending on the facts of each particular case, *Padilla*, 130 S. Ct. at 1485 (". . . to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances"), and the fact that courts must engage in such case-by-case analysis should not influence whether or not the rule itself is "new." *Id.* ("There is no reason to doubt that lower courts—now quite experienced with applying *Strickland*—can effectively and efficiently use its framework to separate specious claims from those with substantial merit.").

We can rest assured that defense lawyers will now advise their clients prior to pleading guilty about the immigration consequences of such a plea, as the Court has clarified that such advice is required under the Sixth

Amendment. But given today's holding, this is of no consequence to Roselva Chaidez despite the fact that professional norms in place at the time of her plea placed the same duty on her counsel. Because I find that *Padilla* simply extended the Supreme Court's holding in *Stickland*, and itself signaled an intent to be applied to noncitizens in Chaidez's position, I respectfully dissent.